# EXHIBIT A

Initial Scheduling Hearing Date and Time:  September 19, 2007 at 10:00 a.m.
Response Deadline:  October 2, 2007 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
Steven C. Bennett (SB 2746)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman (JE 5638)

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
                                                            :
In re                                                       :        Chapter 11
                                                            :
Dana Corporation, *et al.*,                                 :        Case No. 06-10354 (BRL)
                                                            :
                              Debtors.                      :        (Jointly Administered)
                                                            :
----------------------------------------------------------- x

**DEBTORS' OBJECTION TO CLAIMS OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION OF THE DEPARTMENT OF COMMERCE
AND THE DEPARTMENT OF THE INTERIOR ACTING THROUGH
THE FISH AND WILDLIFE SERVICE (CLAIM NOS. 13321 AND 13796)**

WAI-2844643v3

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND REGARDING THE DEBTORS ..................................................... 4

BACKGROUND REGARDING THE CLAIMS PROCESS ....................................... 6

THE PLAN EMERGENCE CONDITION .................................................................. 7

JURISDICTION ....................................................................................................... 8

BASIS FOR RELIEF REQUESTED ......................................................................... 8

OBJECTION TO THE CLAIMS ............................................................................... 9

I.     General Objections.................................................................................... 9

II.    Objections to the Claims Regarding the CDE Site ................................. 10

       A.    Overview of the CDE Site and Related Claims ...................... 10

       B.    General Objections Regarding the CDE Site ......................... 13

       C.    Defense Department Liability for the CDE Site ..................... 14

       D.    Divisibility of Liability ......................................................... 17

       E.    Allocation of Liability ........................................................... 19

       F.    Additional Objections Regarding Operable Unit 1 at the CDE Site ........ 21

       G.    Additional Objections Regarding Operable Unit 2 at the CDE Site ........ 23

       H.    Additional Objections Regarding Operable Unit 3 at the CDE Site ........ 24

       I.    Additional Objections Regarding Operable Unit 4 at the CDE Site ........ 25

       J.    Additional Objections Regarding Natural Resources Claim at the CDE Site ................................................................................. 26

III.   Objections to Claims Relating to Other Sites ...................................... 28

       A.    The Tremont City Site ........................................................... 28

       B.    The Main Street Site ............................................................. 28

       C.    The Lakeland Site ................................................................. 29

       D.    The West Highway 8 Site ...................................................... 30

       E.    The Muskegon Site ............................................................... 31

       F.    The SRSNE Site.................................................................... 31

IV.   Objections Regarding Injunctive Relief at Antwerp/Other Sites ......... 32

V.    Objections Regarding Potential Secured/Administrative Claims ......... 32

RESERVATION OF RIGHTS ................................................................................. 33

**TABLE OF CONTENTS**
(continued)

Page

NOTICE OF OBJECTION ........................................................................................................ 33

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Dana Corporation ("Dana") and 40 of its domestic direct and indirect subsidiaries,

as debtors and debtors in possession (collectively, the "Debtors") hereby object, pursuant to

section 502 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and

Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

consistent with the Order Establishing Claims Objections and Settlement Procedures, dated

November 9, 2006 (Docket No. 4044) (the "Claims Procedures Order"), to (i) proof of claim no.

13796 ("Claim 13796") filed collectively on behalf of the United States Environmental

Protection Agency ("EPA"), the National Oceanic and Atmospheric Administration of the

United States Department of Commerce ("DoC") and the United States Department of the

Interior acting through the Fish and Wildlife Service (collectively with EPA and DoC, the

"Government"), on or about September 21, 2006, in an unliquidated amount against Dana; and

(ii) proof of claim no. 13321 filed on behalf of the EPA, on or about September 21, 2006, in an

unliquidated amount against Debtor Brake Systems, Inc. ("Claim 13321" and, collectively with

Claim 13796, the "Claims"). [1]  As and for their objection (the "Objection"), the Debtors state the

following:

## PRELIMINARY STATEMENT

1.      The Government asserts its Claim pursuant to the Comprehensive

Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.

§§ 9601-9675 ("CERCLA"), with regard to six "Superfund" locations associated in some way,

over the course of more than 100 years, with Dana and its predecessor.  The first five locations

---

[1]      Copies of the Claims are attached hereto collectively as Exhibit A.

involve estimated claims of past and future costs (and penalties) totaling approximately

$65 million. For the final location, at a site formerly operated by Cornell-Dubilier Electronics,

Inc. in South Plainfield, New Jersey (the "CDE Site"),[2] the Government claims more than

$230 million of past and future costs (and penalties). The Government also claims "natural

resources damages," pursuant to section 107(f) of CERCLA, 42 U.S.C. § 9607(f), for damages at

the CDE Site in an amount estimated between $20 and $37 million. Finally, the Government

seeks $145,000 for penalties at one site (in Muskegon, Michigan) and injunctive relief for one

site (in Antwerp, Ohio), and suggests that "Dana also has or may in the future have

environmental liabilities for [unnamed] properties that are part of its bankruptcy estate and/or for

the migration of hazardous substances from property of its bankruptcy estate." Claim 13796,

¶ 57.

       2.     In sum, the Government seeks more than $300 million through the Claims,

making these the largest disputed claims in the Debtors' cases. The Government seeks over

$250 million relating to the CDE Site alone. As such, the CDE Site comprises the largest

component of the Government's Claims and the primary site at issue here.

       3.     The CDE Site was the location of Dana's first manufacturing facility.

At that location, from 1904 to 1929, Dana's predecessor, Spicer Manufacturing Company,

operated a manufacturing plant (the "Plant") that produced parts for the automobile industry,

including universal joints, drive shafts, clutches and coils springs. None of the hazardous

substances that the Government alleges were eventually released at the CDE Site —i.e.,

polychlorinated biphenals ("PCBs") or trichloroethene ("TCE") — were either used or processed

by Dana at the Plant. Indeed, PCBs were not manufactured in the United States until 1929 and

---

    [2]     The CDE Site also is sometimes referred to as the "Hamilton Avenue Site."

never were used during operations by Dana at the Plant. Further, the use of TCE as a degreasing solvent in industrial settings did not become common until the 1930s, and TCE solvent was never used during operations by Dana at the Plant.

4. The environmental conditions at the CDE Site simply have no connection to any activity ever conducted by Dana, and the Government's Claims make no allegation that Dana actually contributed to the contamination at the CDE Site in any way. Instead, the Government's claim is based solely on the fact that Dana was the record owner of the property for a twenty-year period (i.e., 1936 to 1956) when its tenant, CDE, a manufacturer of electrical components, is alleged to have caused PCBs and TCE to be released into the environment.

5. In advancing its claim of joint and several liability against Dana, however, the Government ignores the substantial role that the Department of Defense and its predecessor, the War Department (collectively, the "Defense Department"), played at the CDE Site as part of this nation's defense production efforts during World War II. The Government does not mention the fact that during World War II, the Defense Department utilized, directed and managed the operations then being conducted by CDE at the site and that, as both a legal and equitable matter, therefore, the Government must bear some responsibility for any contamination it alleges was caused by CDE. Instead, the Government seeks to hold Dana jointly and severally liable for the entire liability at the CDE Site, which they claim exceeds $250 million.

6. Nothing in CERCLA immunizes the Government from its own responsibility for the contamination at the CDE Site or requires this Court to impose joint and several liability on Dana. See 42 U.S.C. § 9620 (a)(1). The Government's request for joint and several liability against Dana effectively (and improperly) shifts the Government's own liability to Dana. This Court is not required to give effect to the Government's prosecutorial discretion to

seek joint and several liability here.  See generally In re Momentum Mfg. Corp., 25 F.3d 1132,

1136 & n.4 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity,

empowered to invoke equitable principles to achieve fairness and justice in the reorganization

process . . . .  We have repeatedly emphasized the importance of the bankruptcy court's equitable

power.")

       7.     The inherent unfairness of the Government's claim at the CDE Site is

compounded by the fact that the claim is based on highly speculative and unsupported response

cost projections that speculate about largely undetermined remedial action measures that the

Government asserts may ultimately be necessary to implement at the CDE Site.  These and other

objections to the amounts sought in the Claims are described in greater detail below.

       8.     If, despite these many infirmities, the Government's Claims were

permitted as filed, they would become the largest general unsecured claims against the Debtors'

estates (other than Dana's bond debt), even though Dana did not contribute to the contamination

at the CDE site in any way and bears, at most, only limited responsibility for activities at the

other sites.  Such a result would be highly inequitable, harmful to creditors of the Debtors'

estates and contrary to law.

## BACKGROUND REGARDING THE DEBTORS

       9.     On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.  By an order entered on the Petition

Date, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being administered jointly.  The Debtors are authorized to continue to operate their businesses

and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.

10.      On March 10, 2006, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors, pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").  On June 27, 2006, the U.S. Trustee appointed an official committee of equity security holders, pursuant to section 1102 of the Bankruptcy Code, which committee subsequently was disbanded by the U.S. Trustee on February 9, 2007.  On August 31, 2006, the U.S. Trustee appointed an official committee of non-union retired employees, pursuant to section 1114(d) of the Bankruptcy Code and as directed by an order of the Court entered on August 9, 2006 (Docket No. 2773).

11.      Debtor Dakota New York Corp ("Dakota") is a New York corporation. Debtor Dana is the direct or indirect parent of Dakota and each of the other Debtors.  Dana maintains its corporate headquarters in Toledo, Ohio.  The Debtors and their nondebtor affiliates (collectively, the "Dana Companies") have over 100 leased and owned domestic business locations and have operations in approximately 25 states, as well as in Mexico, Canada, 11 countries in Europe and 14 countries elsewhere in the world.

12.      The Dana Companies are leading suppliers of modules, systems and components for original equipment manufacturers and service customers in the light, commercial and off-highway vehicle markets.  The products manufactured and supplied by the Dana Companies are used in cars; vans; sport utility vehicles; light, medium and heavy trucks; and a wide range of off-highway vehicles.

13.      As disclosed in Dana's Form 10-K filed on March 20, 2007, for the year ended December 31, 2006, the Dana Companies recorded revenue of approximately $8.5 billion

and had assets of approximately $6.7 billion and liabilities totaling $7.6 billion.  As of the

Petition Date, the Dana Companies had approximately 44,000 employees.

14.    On August 31, 2007, the Debtors filed their Joint Plan of Reorganization

for Debtors and Debtors in Possession (Docket No. 6084) (as it may be amended, the "Plan") and

an accompanying Disclosure Statement (Docket No. 6083).

## BACKGROUND REGARDING THE CLAIMS PROCESS

15.    On June 30, 2006, the Debtors filed their respective schedules of assets

and liabilities and statement of financial affairs (collectively, the "Schedules").  By an order

entered on July 19, 2006 (Docket No. 2073) (the "Bar Date Order"), the Court established

September 21, 2006 as the general bar date for creditors to file proofs of claim asserting

prepetition liabilities against the Debtors (the "General Bar Date").  The Bar Date Order, among

other things, also established bar dates for the filing of proofs of claim in response to any

amendments to the Schedules and claims for damages arising from the rejection of executory

contracts and unexpired leases (collectively with the General Bar Date, the "Bar Dates").

16.    After the entry of the Bar Date Order, the Debtors provided notice of the

Bar Dates to all known creditors and potential creditors in accordance with the requirements of

the Bar Date Order.  Nearly 15,000 proofs of claim have been filed in these cases to date.

In addition to the filed proofs of claim, approximately 5,000 claims currently are identified in the

Schedules as liquidated, non-contingent and undisputed.

17.    On October 25, 2006, the Debtors filed the Motion of Debtors and Debtors

in Possession for Order Establishing Claims Objection and Settlement Procedures (Docket

No. 3961) (the "Claims Procedures Motion").  On November 9, 2006, the Court granted the

Claims Procedures Motion and entered the Claims Procedures Order.  Among other things, the

Claims Procedures Order approved certain detailed procedures for the filing and prosecution of

objections to claims filed or scheduled in these chapter 11 cases, as described in Exhibit A to the Claims Procedures Order (the "Claims Objection Procedures").

18.    Notwithstanding the approval of the Claims Objection Procedures, the Claims Procedures Order expressly provided that the Debtors retained their "rights to seek an order of the Court approving additional or different procedures with respect to specific Claims or categories of Claims." Claims Procedures Order ¶ 6. On September 5, 2007, the Debtors exercised that right with respect to the Government's Claims by filing the Motion of Debtors and Debtors in Possession (A) for an Order, Establishing Procedures to Estimate Claims of the United States Environmental Protection Agency, National Oceanic and Atmospheric Administration of the Department of Commerce and the Department of the Interior (Claim No. 13321 and 13796) and (B) to Estimate These Claims Pursuant to the Procedures (Docket No. 6112) (the "Estimation Motion"). By the Estimation Motion, the Debtors seek to establish estimation procedures for the resolution of the Claims without delay.

## THE PLAN EMERGENCE CONDITION

19.    Consistent with a Plan Support Agreement between the Debtors and certain of their stakeholders and potential investors (as further defined in the Plan, the "Plan Support Agreement"), one condition to the effectiveness of the Plan (the "Plan Emergence Condition") is that the total amount of allowed general unsecured claims in certain categories (collectively, the "General Unsecured Claims") shall not exceed $3.25 billion (the "Plan Cap").[3] See Plan at § IV.B.5. The Government's Claims are within the group of General Unsecured Claims covered by the Plan Cap. As described above, although the Claims are contingent and

---

[3]    The Plan Emergence Condition, which requires that General Unsecured Claims must fall within the Plan Cap, may be waived, but only by the Creditors' Committee acting reasonably and consistently with its fiduciary duties to all unsecured creditors.

unliquidated, the amounts asserted by the Government in the Claims exceed $300 million and thus could have a substantial impact on the Debtors' ability to achieve the Plan Emergence Condition in a timely fashion.

20.     Other than the Debtors' unsecured bond claims, which total approximately $1.62 billion, the Debtors believe that the amounts alleged in the Claims would make them the largest potential General Unsecured Claims subject to the Plan Cap (equivalent at the asserted amounts to approximately 20% of the non-bondholder portion of the Plan Cap). Given the potential size of the Claims, the Debtors believe that it is critical to determine the allowed amount of the Claims promptly to avoid undue delay in the administration of these cases and to enhance the Debtors' ability to satisfy the Plan Emergence Condition and emerge from chapter 11 by their stated goal of the end of 2007. To that end, the Debtors have engaged in discussions with the Government to seek a resolution of the Claims. Despite these efforts, the parties have not made substantial progress in reaching agreement on the amounts of the Claims. For these reasons, in the Estimation Motion, the Debtors have proposed procedures to complete an estimation of the Claims under section 502(c) of the Bankruptcy Code by the end of 2007.

## JURISDICTION

21.     This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). See In re Wallace's Bookstores, Inc., 317 B.R. 720, 725 (Bankr. E.D. Ky. 2004) (claims administration is within "core" bankruptcy court subject matter jurisdiction). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BASIS FOR RELIEF REQUESTED

22.     Pursuant to section 502(a) of the Bankruptcy Code, "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, *unless a party in*

*interest . . . objects.*"  11 U.S.C. § 502(a) (emphasis added).  Pursuant to section 502(b) of the

Bankruptcy Code, upon an objection to a claim, the court shall determine the amount of such

claim and allow such claim in that amount, except to the extent that "such claim is unenforceable

against the debtor and property of the debtor under . . . applicable law."  11 U.S.C. § 502(b)(1).

Under section 502(c) of the Bankruptcy Code, the Court "shall" estimate any contingent or

unliquidated claim, "the fixing or liquidation of which, as the case may be, would unduly delay

the administration of the case."  11 U.S.C. 502(c)(1).

        23.    Pursuant to Bankruptcy Rule 3007, an objection to claim "shall be in

writing and filed."  Once an objection to claim has been made and supported, the ultimate burden

of proof rests on the creditor to establish the validity, and quantum, of its claim.  See In re

Spiegel, Inc., 2007 WL 1821101 at *15 n.6 (S.D.N.Y. June 18, 2007) (claimant "always bears

the ultimate burden of persuasion") (quotation omitted).

## OBJECTION TO THE CLAIMS

## I.    GENERAL OBJECTIONS

        24.    Debtors assert the following general objections in response to the Claims:

        (a)    The Claims, in whole or in part, are not supported by sufficient allegation

or proof;

        (b)    The Claims, in whole or in part, are barred by applicable statutes of

limitations;

        (c)    The Claims, in whole or in part, are barred by equitable principles,

including, without limitation, the Government's spoliation of evidence, in the form of its failure

to maintain and provide the Debtors with essential evidence to test and challenge the Claim;

        (d)    The Claims, in whole or in part, are barred by the fact that causation

cannot be established, and/or that alternate causation is the source of some or all of the damages

identified in the Claim (including, in certain instances, causation by natural phenomena of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight);

(e)    The Claims, in whole or in part, are barred by the fact that other responsible parties should bear some or all of the "orphan shares" of the response costs and/or damages identified in the Claim;

(f)    The Claims, in whole or in part, seek amounts for projected remedial costs that are highly speculative and unsupported in nature and amount; and

(g)    The Claim, in whole or in part, seeks damages based on improper remedies that are arbitrary, capricious or otherwise not in accordance with governing law.

## II.    OBJECTIONS TO THE CLAIMS REGARDING THE CDE SITE

### A.    Overview of the CDE Site and Related Claims

25.    The largest component of the liabilities alleged in the Claims (asserted in amounts exceeding $250 million) relates to the CDE Site. Although there is no evidence or allegation that Dana caused or contributed to any release of hazardous materials at the CDE Site, the Government has asserted these substantial damages based on improper and undetermined remedial action measures, with speculative and unsupported costs and without any limitation on the proposed damage claim to account for the actions of other responsible parties, including the United States government itself.

26.    As indicated above, the CDE Site was the location of the first Dana manufacturing facility. Spicer Manufacturing Company, a predecessor to Dana, operated at the CDE Site from approximately 1904 until 1929. At the time it owned and operated the CDE Site, Dana neither used, processed or disposed of PCBs or TCE, the hazardous substances that have driven the Government's cleanup actions at the CDE Site.

27.     Subsequently, the CDE Site was leased to Cornell-Dubilier Electronics, Inc. ("CDE"), a manufacturer of electrical components, from 1936 until 1956, when Dana sold the property to CDE.  CDE continued to operate at the CDE Site until the early 1960s, when it sold the site to the present owner, D.S.C. of Newark, Inc. ("DSC"), a property management firm.  During part of the period when CDE leased the property from Dana, the Defense Department actively utilized the CDE Site for manufacturing activities in support of the United States government's efforts in World War II.  During the war years, operations at the site were directed by the United States government through the Defense Department.

28.     Dana's alleged liability at the CDE Site arises solely as a result of its passive ownership of the site during a period of time when CDE allegedly caused PCB and related contamination.[4]  The Government admits that the sole basis for Dana's alleged liability at the CDE Site is that:

> Dana and its corporate predecessor, Spicer Manufacturing Corp. (collectively Dana), owned the manufacturing property that is part of the [CDE] Facility from approximately 1914 until 1956.  From approximately 1936 until 1956, Dana leased the manufacturing property to [CDE], where CDE operated and manufactured electronic components, including capacitors.  During the period when Dana owned a portion of the Facility and leased it to CDE, CDE used polychlorinated biphenyls ("PCBs") and polychlorinated organic solvents in manufacturing processes and disposed of PCB-contaminated materials and other hazardous substances.

See Claim 13796, ¶ 35.

29.     The EPA began its evaluation of the CDE Site in the late 1990s when the site was added to the National Priorities List (the "NPL").  The site is divided into the following four operable units ("OUs"):  (A) OU-1, relating to soil and dust contamination that remained

---

[4]     Under CERCLA, there are four categories of "covered persons" that can be found liable under the statute.  See 42 U.S.C. § 9607(a)(1)-(4).  Dana is alleged to have liability at the CDE site as a "past owner" of the site under section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

after earlier removal action; (B) OU-2, relating to on-site soil and building contamination; (C) OU-3, relating to groundwater and potential soil vapor; and (D) OU-4, relating to off-site soil sediments in the vicinity of the Bound Brook. See Claim 13796, ¶¶ 34-44.

30.    After the CDE Site was listed on the NPL, but before EPA selected any remedies to clean up the site, Dana worked diligently with community leaders, including the Borough of South Plainfield, to permit the CDE Site to be cleaned up and redeveloped. As a result of Dana's efforts, the South Plainfield Borough Council unanimously passed a resolution in April 2001 that required the Borough's Planning Board to study the feasibility of establishing the area of the CDE Site as a "Redevelopment Area." Thereafter, in October 2001, the Borough's Planning Board recommended that the area be given that designation. Efforts to redevelop the CDE Site continue today.

31.    In 2003, the EPA issued a Record of Decision ("ROD") for OU-1, which identified the EPA's proposed remedy relating to off-site soil and dust contamination. The EPA subsequently issued a Unilateral Administrative Order in 2004 for its past costs and the performance of the OU-1 work (the "OU-1 Administrative Order"). The Government's claim includes an estimated cost recovery claim of $3.5 million for OU-1. Claim 13796, ¶ 38. In 2004, the EPA issued a ROD for OU-2, identifying a remedy that ignored comments submitted by Dana and CDE relating to the technical feasibility, implementability and cost effectiveness associated with the proposed plan. Moreover, the EPA's ROD for OU-2 ignored the fact that the Borough of South Plainfield's governing body had unanimously approved a resolution that endorsed Dana's and CDE's alternative remedy rather than the EPA's. The Government's claim includes an estimated cost recovery claim of $89.5 million for OU-2. Claim 13796, ¶ 39. Remedial work for both OU-1 and OU-2 is in the initial stages.

32.     Work on the remedial investigation/feasibility study (the "RI/FS") for OU-3 is ongoing.  Work on the RI/FS for OU-4 has not yet been initiated.  As a result, the administrative record for OU-3 and OU-4 remains incomplete, and no remedy has been selected for either OU-3 or OU-4.  Nevertheless, the claim for the CDE Site includes estimated cost recovery claims of $25 million and $55 million for OU-3 and OU-4, respectively, plus additional estimated indirect costs of $50 million.  Claim 13796, ¶¶ 40-43.

33.     With respect to the CDE Site, the Government also asserts civil penalties of approximately $13.1 million, punitive damages estimated by EPA to be $3.5 million, stipulated penalties of $200,000 and a natural resource damage claim estimated by the United States government to be in the range of $20 million to $37 million.  Claim 13796, ¶¶ 45-48.

**B.     General Objections Regarding the CDE Site**

34.     Dana denies that there was disposal of hazardous wastes at the time that it was an "owner or operator" of the CDE Site, within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).  Indeed, the Government does not claim that Dana has any liability for actually operating the facility at the CDE Site, or for arranging for disposal of hazardous substances at the CDE Site.  See Claim 13796, ¶ 35.  Nor does the Government allege that Dana's own actions contributed to the disposal or release of hazardous substances at the CDE Site.  The Government, moreover, fails entirely to mention the current owner of the site, DSC, or the Government's own role at the site through the activities of the Defense Department. Yet the Government seeks to impose joint and several liability on Dana for the full amount of its estimated remediation costs at the CDE Site, despite the Government's own involvement in the site and the lack of any improper action or conduct by Dana, and despite the highly speculative, inflated and unsupported figures claimed in connection with the Government's unjustified remedial actions.

35.     The Government's planned and completed removal, remedial and other response actions at the CDE Site, including its alleged finding of an imminent and substantial endangerment to the public health, welfare or the environment and issuance of a Unilateral Administrative Order to Dana, individually and/or as a whole, were arbitrary and capricious or otherwise not in accordance with the law.

36.     Because the Government's planned and completed removal, remedial and other response actions at the CDE Site, in whole or in part, were arbitrary and capricious or otherwise not in accordance with the law, the Government's claim for past and future response costs, penalties and/or damages due to Dana's alleged failure to comply with an Administrative Order issued to it, is barred, in whole or in part, by the provisions of 42 U.S.C. § 9613(j), thereby providing Dana with "sufficient cause" within the meaning of 42 U.S.C. § 9606(b) not to comply with the OU-1 Administrative Order.

37.     Moreover, to the extent that any alleged disposal of hazardous substances at the CDE Site occurred during the period when Dana owned a portion of the site, such disposal activity was caused, in whole or in part, by actions of the Government or its agents or contractors, thus giving Dana an additional basis for "sufficient cause" under 42 U.S.C. § 9606(b) and a defense to the Government's claim for response costs, penalties and damages at the CDE Site for Dana's alleged failure to comply with the OU-1 Administrative Order.

38.     Additional information relating to these and other defenses to the Government's alleged liabilities at the CDE Site is set forth below.

**C.     Defense Department Liability for the CDE Site**

39.     The Government admits that a crucial period in the operation of the CDE Site occurred during and after World War II.  See Claim 13796, ¶ 35 (stating that CDE leased the CDE Site from 1936 until 1956 and during that period used PCBs and other solvents).  To the

extent that the Government's evidence shows that the disposal of hazardous substances occurred during this time, such disposal or other activity took place, in whole or in large part, at the direction and/or under the supervision of agencies of the United States (including, but not limited to, the War Department and its successor, the Defense Department), and without the actual knowledge of Dana.

40.     The Claim fails to explain the significance of this operation during the World War II period. As the Government has been informed, the Defense Department played a "very substantial role" in "all aspects" of the CDE Site during World War II. See Letter from Robert S. Sanoff (counsel for CDE) to Sarah P. Flanagan (counsel for EPA), Dec. 13, 2004 (Exhibit B, annexed hereto). Indeed, as summarized in a memorandum based on extensive historical documents from the Defense Department and other government files, "the United States military was pervasively involved in operations at the South Plainfield facility [the CDE Site] during World War II." See id. (Memo to File, Dec. 13, 2004) (citing official documents). Moreover, the Defense Department "pushed aggressively" to increase the volume of capacitors produced at the CDE Site during World War II; that pressure to service "urgent war needs" may have caused "substantial releases to the environment of the raw materials used in the manufacturing process[.]" Id. at 2.

41.     As a result of the Defense Department's substantial role in controlling the operations at the CDE Site, including raw materials processing and waste generation, the Defense Department is a "Covered Person" within the meaning of sections 107(a)(2) and (3) of CERCLA , 42 U.S.C. § 9607(a)(2) and (3). Courts have recognized that the United States is subject to CERCLA liability "in the same manner and to the same extent" as any other person or entity under 42 U.S.C. § 9620(a)(1). See Cadillac Fairview/California, Inc. v. Dow Chem. Co.,

299 F.3d 1019, 1029 (9th Cir. 2002) (allocating all cleanup costs to the government due to its liability); United States v. Shell Oil Co., 294 F.3d 1045, 1061 (9th Cir. 2002) (allocating 100% of cleanup costs for bezol waste to the government); FMC Corp. v. U.S. Dep't. of Commerce, 29 F.3d 833, 844-46 (3d Cir. 1994) (affirming District Court's finding that government was liable, as an "operator" of the site and an "arranger"); United States v. Iron Mountain Mines, Inc., 881 F. Supp. 1432, 1441-47 (E.D. Cal. 1995); see also United States v. Atlantic Research Corp., 127 S. Ct. 2331 (2007) (affirming party's right to sue government for cost recovery under CERCLA).

42.     The Government claimants here cannot divorce themselves from the liability of their sister agency, the Defense Department, by claiming that Dana should shoulder "joint and several" liability for the cleanup of the CDE Site.  Where, as here, one agency of the United States has CERCLA liability, basic principles of equity should preclude other agencies of the Government from attempting to use the doctrine of joint and several liability inequitably to shift substantial liabilities onto another party.  See Cadillac Fairview, 299 F.3d at 1029 ("placing the cost of war on the United States and thus society as a whole is consistent with CERCLA").  Joint and several liability is intended to protect an "innocent plaintiff" from having its recovery limited by some factor beyond its control.  See McDermott, Inc. v. AmClyde, 511 U.S. 202, 220-21 (1994); In re WorldCom, Inc. Sec. Litig., 2005 WL 613107, *6 (S.D.N.Y 2005).

43.     Moreover, because the United States can use the Judgment Fund (31 U.S.C. § 1304)[5] in connection with its own liability (and that of its agents, such as CDE) it has another means to obtain response cost recovery at the CDE Site.  See Matter of: The Judgment Fund and Litigative Awards Under CERCLA, 1993 U.S. Comp. Gen. LEXIS 1146 at

---

[5]     The Judgment Fund is a permanent, indefinite appropriation that is available for use by the United States to cover amounts owed by it by virtue of judgments or compromise settlements.

*1 (November 29, 1993).  Thus, the Government is not an "innocent plaintiff" whose recovery at the CDE Site is beyond its control.

44.      To the contrary, the Government's recovery is largely, if not entirely, within its own control.  Therefore, the Government should not have standing to assert a claim for joint and several liability, since its claim is quintessentially one for contribution and one that effectively seeks to shift the Government's own liability to Dana.  See United States v. Scott's Liquid Gold, Inc., 934 F. Supp. 362, 364 (D. Colo. 1996) (CERCLA action by the government for cost recovery at site where the government had liability was deemed one for "contribution," and thus not subject to joint and several liability); see also Atlantic Research Corp. 127 S. Ct. at 2337 ("Because all PRPs are liable under the statute, a claim by one PRP against another PRP necessarily is one for contribution.").  To permit the Government to do otherwise would violate fundamental principles of equity.  Cf. Atlantic Research Corp. v. United States, 459 F.3d 827, 837 (8th Cir. 2007) (the government cannot "insulate itself from responsibility for its own pollution by simply declining to bring a CERCLA cleanup action or refusing a party's offer to settle.  This bizarre outcome would eviscerate CERCLA whenever the Government itself was partially responsible for site contamination.").

**D.      Divisibility of Liability**

45.      The Government does not allege that any release or disposal of hazardous substances occurred during the time that Dana, through its predecessor, operated a plant at the CDE Site.  See Claim 13796, ¶ 35 (noting operation from 1914 by Dana, but claiming contamination only after 1936, when Dana leased portion of the CDE Site to CDE and conducted no operations at the site).  In fact, prior to 1936, there is no evidence that Dana used or processed PCBs, TCE or other hazardous substances at the CDE Site and, indeed, the commercialization of

these substances for use in manufacturing operations post-dates Dana's termination of its use of the site in 1929.

46.    Instead, the Government admits that, at most, Dana owned "a portion" of the CDE Site, and leased that portion to CDE for only a portion of the time that CDE operated at the site. See Claim 13796, ¶ 35.

47.    As a result, Dana's liability, if any, is "divisible;" that is, Dana cannot be held liable on a "joint and several" basis. Instead, Dana is liable only for that portion of the harm for which it is shown to be a distinct and independent cause. See Restatement (Second) of Torts § 433A (1965) (where two or more joint tortfeasors act independently and cause a distinct or single harm for which there is a reasonable basis for division, each is liable only for its own portion of the harm); see also United States v. Alcan Aluminum Corp. (Alcan-Butler), 964 F.2d 252, 268-69 (3d Cir. 1992) (citing Restatement); United States v. R.W. Meyer, 889 F.2d 1497, 1506-08 (6th Cir. 1989) (same).

48.    As the Second Circuit indicated in United States v. Alcan Aluminum Corp. (Alcan-PAS), 990 F.2d 711 (2d Cir. 1993), based on these principles, a party "may escape any liability for response costs" if it succeeds in proving that its activities "did not contribute to the release and the cleanup costs that followed, or contributed at most to only a divisible portion of the harm." Alcan-PAS, 990 F.2d at 722. Further, as the Sixth Circuit held in United States v. Twp. of Brighton, 153 F.3d 307 (6th Cir. 1998), the divisibility defense is not limited to "generators" whose liability arises under 42 U.S.C. § 9607(a)(3), but extends to parties alleged to have status liability as an "owner and operator" under 42 U.S.C. § 9607(a)(2). See Twp. of Brighton, 153 F.3d at 319-20 (Township should be entitled to show "temporal, geographic or volumetric" divisibility of harm); see id. at 320 ("relative toxicity, migratory potential, degree of

migration, and synergistic capacities of the hazardous substances . . . can be a reasonable basis

for dividing harm (<u>even between two contemporaneous operators</u>, if their operating

responsibilities are sufficiently distinguishable)) (citing <u>Alcan-PAS</u>) (emphasis added).

49.     Given the absence of any allegation or evidence showing that Dana itself

used or disposed of any hazardous substances at the CDE Site and the countervailing evidence

indicating that, to the extent that there was any contamination that occurred while Dana owned

the site, CDE (on its own and/or at the direction of the Defense Department) and/or the Defense

Department itself caused the contamination, joint and several liability cannot be imposed on

Dana.  Instead, there is a reasonable basis for apportioning the contamination at the site to the

parties that are actually responsible for contributing to such contamination.

E.     **Allocation of Liability**

50.     Under the terms of CERCLA, even where a party might (in theory) be

subject to joint and several liability, a court may "allocate response costs among liable parties

using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

51.     Under this standard, courts have consistently held that a party with

nominal, if any, actual role in contamination, should have nominal or no share of liability.  <u>See,</u>

<u>e.g.</u>, <u>Cadillac Fairview</u>, 299 F.3d at 1026 (holding government liable for 100% of costs); <u>Shell</u>

<u>Oil</u>, 294 F.3d 1045 (holding government liable for 100% of costs associated with bezol waste).

52.     In <u>Kalamazoo River Study Group v. Rockwell Int'l Corp.</u>, 274 F.3d 1043

(6th Cir. 2001), for example, the court addressed a CERCLA contribution suit brought by an

association of paper companies, with multiple facilities that deposited PCBs into the Kalamazoo

River, against an auto parts manufacturer (Rockwell).  The paper manufacturers sought

contribution for costs incurred in responding to releases of PCBs into a river.  <u>Id.</u> at 1046.  The

District Court found that the parties collectively had released a sufficient amount of PCBs to face

liability under the threshold of significance standard. Id. But the District Court observed that Rockwell's release appeared to be "minimal in comparison to the release of PCBs" by the plaintiffs. Id.

53. After the liability stage, the District Court in Kalamazoo considered the proper allocation of response costs between the paper manufacturers and Rockwell. Id. The Court identified three factors as generally relevant to the allocation of response costs:

(a) the relative quantities of PCBs released by the parties;

(b) the relative toxicity of those PCBs; and

(c) the cooperation of the parties with the regulatory authorities.

The Kalamazoo Court determined that the latter two factors did not favor any particular allocation and focused on the quantity of PCBs that the parties released. Id. at 1047. The Court ultimately found that Rockwell had released "no more than 20 pounds of PCBs from its . . . facility" compared to "hundreds of thousands of pounds" released by the paper manufacturers. Id. The District Court thus did not apportion any liability to Rockwell. The paper manufacturers appealed. Id.

54. The Sixth Circuit, in affirming the District Court's allocation, addressed multiple arguments. The Appeals Court held that, even if a party otherwise may be strictly liable under CERCLA, a "liability determination . . . is just the first element of a contribution claim." Id. at 1049. "Recovery of response costs by a private party under CERCLA is a two-step process. Initially, a plaintiff must prove that a defendant is liable under CERCLA. Once that is accomplished, the defendant's share of liability is apportioned in an equitable manner." Id. The Sixth Circuit affirmed the District Court's discretion to apportion liability based on "the relative quantities of PCBs released by the parties." Id. Under the facts presented, the Sixth

Circuit's affirmance meant that Rockwell was not responsible for any of the liability at issue due to its minimal contribution to the release of hazardous materials.

55.     Here, because Dana itself did not dispose of hazardous substances when it was the owner of a portion of the CDE Site, and did not direct or control, or have knowledge of the release by, any other parties (including the Defense Department and its agent, CDE), principles of equity dictate that Dana should not be allocated any material liability for cleanup of the CDE Site.

**F.    Additional Objections Regarding Operable Unit 1 at the CDE Site.**

**(i)    Objections to OU-1 Cost Claims**

56.     OU-1 at the CDE Site pertains to "excavation of soils contaminated with PCBs from certain residential and commercial properties, and the investigation of additional properties to determine which such properties will require remediation." Claim 13796, ¶ 38. OU-1 thus relates to off-site soil and dust contamination.

57.     The Government wrongly claims that Dana "refused" to perform work under the OU-1 Administrative Order dated August 2004. See Claim 13796, ¶ 38. To the contrary, Dana submitted detailed comments in response to the OU-1 Administrative Order. See Letter from Michael P. Last (counsel for Dana) to Sarah P. Flanagan (counsel for EPA) (Exhibit C, annexed hereto), dated September 28, 2004 (the "September 28, 2004 Letter"). These comments set forth Dana's "sufficient cause" defense to the OU-1 Administrative Order, and explained why the Order was arbitrary and capricious and/or otherwise not in accordance with law. Dana adopts herein the defenses set forth in those comments.

58.     As detailed in the September 28, 1004 Letter, the Government did not establish a basis for concluding that there may be an imminent and substantial endangerment to the public health, welfare or the environment that would justify the issuance of the OU-1

Administrative Order, and the OU-1 RI/FS and ensuing OU-1 ROD are inconsistent with the requirements of the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

59.     The Government admits that it has only "estimates" of what it will cost to perform the remaining remedial work at OU-1 ($3.5 million). See Claim 13796, ¶ 38. These "estimates" reflect an unexplained and unsupported, almost five-fold increase in the Government's original cost estimate of $760,000 for the OU-1 remedy, as set forth in the OU-1 ROD.

60.     Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

     **(ii)**     **Objections to OU-1 Penalty Claims**

61.     The Government claims that it is entitled to "civil penalties and punitive damages" for violation of the OU-1 Administrative Order. See Claim 13796, ¶ 45.

62.     The Government admits that the civil penalty can only be estimated at "up to" $13,130,000. See Claim 13796, ¶ 47.

63.     The Government admits that punitive damages "cannot be calculated until EPA has completed the OU-1 [remedial design/remedial action] RD/RA[.]" See Claim 13796, ¶ 47. The Government has thus only "estimated" punitive damages at $3.5 million. Id.

64.     Some or all of these penalty and punitive damage claims have been overstated, and/or underlying costs are (or were) not "necessary" within the meaning of CERCLA, and thus should not be allowed.

65.    These penalty and punitive damage claims are not allowable under the provisions of 42 U.S.C. § 9606(b), since Dana had "sufficient cause" not to comply with the OU-1 Administrative Order.

**G.    Additional Objections Regarding Operable Unit 2 at the CDE Site**

66.    OU-2 at the CDE Site pertains to "contaminated soil and buildings at the former manufacturing property that is part of the CDE Facility." Claim 13796, ¶ 39. OU-2 thus relates to on-site soil and building contamination.

67.    The Government notes that it determined a remedy for OU-2 by issuing a ROD on September 30, 2004 (see Claim 13796, ¶ 39), but fails to state that Dana submitted detailed substantive comments on the proposed remedy, and that the Government ignored those comments, in favor of a proposed plan subject to technical feasibility, implementability and cost effectiveness concerns. See Exhibit D, annexed hereto. Dana adopts herein the defenses set forth in those comments.

68.    The Government admits that it has only "estimates" of what it will cost to perform remedial work at OU-2 ($89.5 million). See Claim 13796, ¶ 39. These "estimates" are particularly unsupported in that they provide no explanation why EPA's prior estimates for the cost of the OU-2 remedial work (specified at $69,000,000 in the OU-2 ROD) have been increased. Moreover, these unsupported and markedly increased cost estimates further evidence the lack of cost-effectiveness of the OU-2 remedy, which was detailed in Dana's comments. See Exhibit D.

69.    Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

**H.    Additional Objections Regarding Operable Unit 3 at the CDE Site**

**(i)    Objections to OU-3 Cost Claims**

70.    OU-3 pertains to "contaminated groundwater and associated soil vapor" at the CDE Site.  Claim 13796, ¶ 40.

71.    The Government admits that no RI/FS has yet been completed (i.e., the study to determine the appropriate remedial action for OU-3).  See Claim 13796, ¶ 39 (stating that the study was ceased after Dana's bankruptcy filing).  Thus, "investigations at [OU-3] at the CDE Facility are continuing and the OU-3 remedy has not yet been selected[.]"  Id. The Government has not issued a ROD, and therefore has not selected a remedy, with regard to OU-3.

72.    The Government admits that it has only "estimates" of what it will cost to perform the undetermined remedial work at OU-3 ("approximately" $25 million).  These "estimates" are speculative and unsupported and make no apparent attempt to factor in the impact of the public input required under section 117 of CERCLA, 42 U.S.C. § 9617, nor the fact that any remedy may need to be revisited under section 121(c) of CERCLA, 42 U.S.C. § 9621(c).  The need to subject any possible future remedies underlying the EPA's "estimates" to the public participation and review provisions of CERCLA serves to highlight both that the asserted claim amounts are speculative and that resolution of the claim could take many years absent estimation by the Court (as requested in the Estimation Motion).  Moreover, EPA's "estimate" for the OU-3 RI/FS cost component is more than 3.5 times the amount that Dana's own contractor had included in its cost proposal to perform the OU-3 RI/FS work, thus indicating that the speculative OU-3 "estimates" likely are substantially inflated.  See Claim 13796, ¶ 39.

73.     The Government also "estimates" that it will incur "indirect costs" for the remediation of both OU-3 and OU-4 ("approximately" $50 million), if the EPA performs the work (as opposed to some other party). See Claim 13796, ¶ 43.  The Government offers no breakdown of, or support for, these indirect costs, as between OU-3 and OU-4.

74.     Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

**(ii)     Objections to OU-3 Penalty Claims**

75.     The Government claims that it is entitled to "stipulated penalties" of $200,000 for violation of the AOC for the OU-3 RI/FS.  See Claim 13796, ¶ 48.  To the extent stipulated, these penalties must be treated as general unsecured nonpriority claims, subject to the treatment provided in a confirmed and effective plan of reorganization.

**I.     Additional Objections Regarding Operable Unit 4 at the CDE Site**

76.     OU-4 pertains to "contaminated sediments in the Bound Brook corridor" adjacent to the CDE Site.  Claim 13796, ¶ 41.

77.     The Government admits that, because investigations at this unit are "continuing" and the final remedy for this unit has not yet been selected, "the cost of the OU-4 work is uncertain at this time[.]"  Claim 13796, ¶ 41.  The Government has not performed any RI/FS or issued any ROD with regard to a remedy for OU-4.

78.     The Government admits that it has only "estimates" of what it will cost to perform the undetermined remedial work at OU-4 ("approximately" $55  million).  See Claim 13796, ¶ 41.  These "estimates" are speculative and unsupported and make no apparent attempt to factor in the impact of the public input required under CERCLA section 117, 42 U.S.C.

§ 9617, nor the fact that any remedy may need to be revisited under CERCLA section 121(c), 42 U.S.C. § 9621(c). The need to subject any possible future remedies underlying the EPA's "estimates" to the public participation and review provisions of CERCLA serves to highlight both that the asserted claim amounts are speculative and that resolution of the claim could take many years absent estimation by the Court (as requested in the Estimation Motion).

79.     The Government also "estimates" that it will incur "indirect costs" for the remediation of both OU-3 and OU-4 ("approximately" $50 million), if the EPA performs the work (as opposed to some other party). See Claim 13796, ¶ 43. The Government offers no breakdown of, or support for, these indirect costs, as between OU-3 and OU-4. Some or all of the OU-4 costs are not recoverable, since the alleged releases associated with OU-4 were the result of unanticipated or unforeseeable climatic conditions (i.e., two 100-year floods in nine years) that could not have been prevented or avoided and which qualify as an "Act of God" under 42 U.S.C. § 9607(b)(1).

80.     Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

### J.    Additional Objections Regarding Natural Resources Claim at the CDE Site.

81.     The Government claims that Dana is liable for "injuries to natural resources caused by the release of hazardous substances" at the CDE Site. Claim 13796, ¶ 50.

82.     The Government admits that, if any such damages are recoverable, they must be limited to "reasonable" costs to "restore, replace or acquire the equivalent of the injured natural resources, plus the reasonable costs of assessing the damages." Claim 13796, ¶ 51.

83.    The Government admits that, because "remedial action has not been completed," the eventual amount of natural resources damages is "unknown." Id.

84.    The Government admits that it has only "estimates" of natural resources damages, "between $20 million and $37 million," for the CDE Site. Id.

85.    Some or all of these additional costs or damages are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs and damages allegedly incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

86.    In addition to reasons stated above as to why the Government's removal, remedial and response actions and costs at the CDE Site are invalid, the Government's natural resources damage claim under section 107(f) of CERCLA, 42 U.S.C. § 9607(f), should be barred, in whole or in part, for one or more of the following reasons:

(a)    the alleged releases, injuries, destruction, loss and damages were not proximately caused by any actions of Dana, as required under section 107(A)(4) of CERCLA, 42 U.S.C. § 9607(A)(4);

(b)    the alleged releases, injuries, destruction, loss and damages were to resources not within the actual or sole trusteeship of the Government and the Government lacks standing to assert the right to recovery for injuries to resources over which it is not the trustee;

(c)    the alleged releases, injuries, destruction, loss and damages were the result of unanticipated or unforeseeable climatic conditions (i.e., two 100-year floods in nine years) that could not have been prevented or avoided and which qualify as an act of God under section 107(b)(1) of CERCLA , 42 U.S.C. § 9607(b)(1);

(d)    the alleged releases, injuries, destruction, loss and damages occurred wholly before December 11, 1980 and are barred by section 107(f)(1) of CERCLA, 42 U.S.C. § 9607(f)(1);

(e)    the costs incurred by the Government in assessing such injuries, destruction or loss were not "reasonable," as required under section 107(a)(4)(c) of CERCLA, 42 U.S.C. § 9607(a)(4)(C), and the Government did not comply with the mandatory conditions precedent to pursue recovery, as required under section 113(g)(1), 42 U.S.C. § 9613(g)(1).

## III.    OBJECTIONS TO CLAIMS RELATING TO OTHER SITES

### A.    <u>The Tremont City Site</u>

87.    The Government contends that Dana (along with 14 others) has already "paid a sum" on account of the site at 3108 Snyder-Domer Road in Tremont City, German Township, Clark County, Ohio (the "<u>Tremont City Site</u>").  See Claim 13796, ¶ 7.

88.    The Government admits that EPA entered into an Administrative Order on Consent, under which Potentially Responsible Parties ("<u>PRPs</u>") agreed to perform a remedial investigation/feasibility study at the Tremont City Site.  <u>See id.</u>

89.    The Government claims that Dana is jointly and severally liable for an additional $430,000 in unreimbursed past response costs and an estimated $7,650,000 in future response costs for the Tremont City Site.  <u>See id.</u>, ¶¶ 8-9.

90.    Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

91.    Dana should not be held liable for the entire set of past and future response costs associated with the Tremont City Site.  Instead, those costs should be allocated, equitably, among the responsible parties, as described above.[6]

### B.    <u>The Main Street Site</u>

92.    The Government admits that Dana was not an owner or operator of the site at 942 North Main Street, Elkhart, Elkhart County, Indiana (the "<u>Main Street Site</u>") at the time of disposal of hazardous substances.  <u>See</u> Claim 13796, ¶ 11 (degreasing operations were owned by

---

[6]    The EPA initially assigned Dana a share of 0.1% of the potential liabilities relating to the Tremont City Site.  The EPA has not explained why it now seeks joint and several liability for this site.

Durakool, Inc. and Excel Corp.). Instead, the Government claims that Dana is liable for having acquired one of two companies actually responsible for the disposal. See id., ¶ 13 (asserting that "Dana acquired Durakool or its successor(s)").

93.    The Government admits that it issued a Unilateral Administrative Order to "nine responsible parties," in 1992, on account of the Main Street Site, and that Dana was not one of those parties. See Claim 13796, ¶ 12.

94.    Dana should not be held liable for the entire set of past and future response costs associated with the Main Street Site. Instead, those costs should be allocated, equitably, among the responsible parties.

95.    The Government claims that Dana is liable for $1,053,735.10 in past and future oversight, response and disposal costs for the Main Street Site. See Claim 13796, ¶¶ 14-16.

96.    Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

C.    **The Lakeland Site**

97.    The Government admits that Dana, along with three other parties, previously agreed to conduct a remedial investigation at the Lakeland Landfill in the City of Claypool, Kosciusko County, Indiana (the "Lakeland Site"). See Claim 13796, ¶ 20. The Government does not claim any costs for that investigation. See id.

98.    The Government admits that it issued a Unilateral Administrative Order to Dana and "four other responsible parties," in 1994, on account of the Lakeland Site. See Claim 13796, ¶ 21.

99.    Dana should not be held liable for the entire set of past and future response costs associated with the Lakeland Site. Instead, those costs should be allocated, equitably, among the responsible parties, as described above.[7]

100.    The Government claims that Dana is liable for $4,709,000 in past and future response and disposal costs for the Lakeland Site. See Claim 13796, ¶¶ 22-24.

101.    Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

**D.    The West Highway 8 Site**

102.    The Government admits that it has issued no orders to Dana or any of the other Debtors with regard to the site near the intersection of West Highway 8 & Highway 281, with a physical address of 1900 Summit Avenue in Hastings West Industrial Park, Hastings, Nebraska (the "West Highway 8 Site"). See Claim 13796, ¶¶ 28-30 (Dana entered into "voluntary" agreement only with Nebraska State agency).

103.    The Government claims that Dana is liable for $8,243,000 in past and future response costs for the West Highway 8 Site. See Claim 13796, ¶¶ 32-33.

104.    Some or all of these additional costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred, are (or were) inconsistent with the NCP and/or the result of arbitrary or capricious action by the Government, and thus should not be allowed.

---

[7]    Under the terms of a cost sharing arrangement between Dana and certain other parties with potential liabilities relating the Lakeland Site, Dana's share of the costs at this site was set at 9.2%.

E.    **The Muskegon Site**

105.    The Government claims that Dana is liable for $145,000, as a civil penalty, with regard to a site at 2051 South Harvey Street, Muskegon, Michigan (the "Muskegon Site"). See Claim 13796, ¶¶ 1(d) (referencing Muskegon Site), 52 (claiming penalty).

106.    The Government admits that the proposed Consent Decree that forms the basis for this penalty claim was not "approved and executed by the appropriate officials for the United States," prior to the filing of the Debtors' bankruptcy petition. See Claim 13796, ¶ 52(f).

F.    **The SRSNE Site**

107.    The Government contends that Debtor Brake Systems Inc. ("Brake Systems"), along with approximately 250 other parties, previously entered into two Administrative Orders on Consent to perform Non Time-Critical Removal Actions at the Solvents Recovery Service of New England, Inc. Superfund Site, located in Southington, Connecticut (the "SRSNE Site"). See Claim 13321, ¶ 7.

108.    The Government claims that Brake Systems  is jointly and severally liable for approximately $13,800,000 in unreimbursed past response costs and an estimated $30,600,000 in future response costs for the SRSNE Site. See id., ¶¶ 8, 10.

109.    Some or all of these costs are (or were) not recoverable by the Government because the response, removal and/or remedial actions taken and the costs incurred are (or were) inconsistent with the NCP and/or the result of arbitrary and capricious action by the Government, and thus should not be allowed.

110.    Brake Systems should not be held liable for the entire set of past and future response costs associated with the SRSNE Site. Instead, those costs should be allocated, equitably, among the responsible parties.[8]

## IV.    OBJECTIONS REGARDING INJUNCTIVE RELIEF AT ANTWERP/OTHER SITES

111.    The Government asserts that, with regard to a site in Antwerp, Ohio (the "Antwerp Site"), it is "not required to file a proof of claim with respect to Dana's injunctive obligation" to comply with an Administrative Consent Order. See Claim 13796, ¶¶ 53, 55. Dana continues to own the property comprising the Antwerp Site and is complying with its obligations under applicable environmental laws. As such, the EPA is not entitled to any claim in the Debtors' chapter 11 cases on account of the Antwerp Site (for injuctive relief or otherwise).

112.    The Government also asserts that it need not file a proof of claim for other "remaining work requirements under [unspecified] CERCLA administrative orders[.]" See id. The Debtors object to this statement as unduly broad and undefined.

## V.    OBJECTIONS REGARDING POTENTIAL SECURED/ADMINISTRATIVE CLAIMS

113.    The Government admits that each of its Claims is a "general unsecured claim," except "to the extent of any secured/trust interest in insurance proceeds received by the Debtor on account of environmental claims of the United States, and to the extent administrative expense priority exists related to property of the estate, post-petition violations of law, or otherwise." See Claim 13796, ¶ 62; see id., ¶ 57 (purportedly reserving right to file "application

---

[8]    Under the terms of a cost sharing arrangement between Brake Systems and certain other parties to the Administrative Orders on Consent, Brake System's percentage share of the costs at this site were set at 0.022%.

for administrative expense or take other appropriate action in the future with respect to property

of the estate"); Claim 13321, ¶ 15.

114.    The Debtors submit that there is no basis for the Government to assert

secured or administrative expense priority status with regard to any portion of its Claims, and

that the Government is not entitled, at this time, to "reserve" the right to file such a claim with

respect to the liabilities addressed by the Claims.  Any amounts allowed on account of the

Claims should be treated as general unsecured non-priority claims.

## RESERVATION OF RIGHTS

115.    The Debtors expressly reserve the right to amend, modify or supplement

this Objection, and to file additional objections to any other claims that may be asserted by the

Government against the Debtors.  If one or more of the grounds stated in this Objection are

overruled, the Debtors reserve their rights to object to all or any portion of the Claims on any

other grounds that bankruptcy and nonbankruptcy law permit.

116.    Without limiting the generality of the foregoing, the Debtors specifically

reserve the right to amend this Objection, file additional papers in support of this Objection or

take other appropriate actions, including to:  (a) respond to any allegation, legal theory or claim

that may be raised in a response by or on behalf of the Government; (b) object further to the

extent that the Government provides (or attempts to provide) additional documentation or

substantiation; and (c) object further to the Claims based on additional information that may be

discovered upon further review by the Debtors or through discovery pursuant to applicable

provisions of the Bankruptcy Rules.

## NOTICE OF OBJECTION

117.    Consistent with the Claims Objection Procedures, notice of this Objection

has been given to:  (a) the parties identified on the Special Service List and the General Service

List in these cases; and (b) the Government, by and through its counsel at the Office of the United States Attorney for the Southern District of New York.  The Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter an order, substantially in the form attached hereto as Exhibit E, pursuant to section 502 of the Bankruptcy Code, granting the relief requested herein by (i) disallowing and expunging the Claim or (ii) otherwise finally establishing the amount and treatment of the Claim for purposes of allowance, treatment and distribution in these chapter 11 cases, thereby precluding the Government from receiving any distribution from the Debtors' estates on account of such Claims except to the extent expressly allowed by the Court; and (b) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  September 7, 2007
New York, New York

Respectfully submitted,


/s/ Corinne Ball
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
Steven C. Bennett (SB 2746)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Heather Lennox (HL 3046)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (JE 5638)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION