# EXHIBIT C

~8145821.txt

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

4          In the Matter

5              of                        Index No.
                                         06-10354
6   DANA CORPORATION,

7                          Debtors.

8   --------------------------------x

9                              September 19, 2007

10                             United States Custom House
                               One Bowling Green
11                             New York, New York 10004

12

13

14        Hearing in re Jones Day Notice of Amended Agenda

15   of Matters Scheduled.

16

17

18

     B E F O R E:
19
                        HON. BURTON R. LIFLAND,
20
                                  U.S. Bankruptcy Judge
21

22

23

24

25

                                                        2


1   A P P E A R A N C E S:

2

                        Page 1

~8145821.txt

```
 3
                    JONES DAY
 4
            Attorneys for the Debtors
 5                    1420 Peachtree Street, N.E.
                      Atlanta, Georgia 30309
 6
                BY:  JEFFREY B. ELLMAN, ESQ.,
 7
                      RICHARD H. ENGMAN, ESQ.,
 8                    STEVEN C. BENNETT, ESQ.,
                      222 East 41st Street
 9                    New York, New York 10017
10                    KEVIN P. HOLEWINSKI, ESQ.
                      51 Louisiana Avenue, N.W.
11                    Washington, D.C. 20001
12
13
                PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
14
            Conflicts Counsel for the Debtors
15                    780 Third Avenue
                      New York, New York 10017
16
                BY:  ROBERT J. FEINSTEIN, ESQ.,
17                    MARIA A. BOVE, ESQ.
18
19
                KRAMER LEVIN NAFTALIS & FRANKEL LLP
20
                  Attorneys for the Committee of Unsecured
21                Creditors
                  1177 Avenue of the Americas
22                New York, New York 10036
23              BY:  THOMAS MOERS MAYER, ESQ.,
                      STEPHEN ZIDE, ESQ.
24
25
```
⚥

3

```
 1    A P P E A R A N C E S (Continued):
 2
 3
                    DIANA G. ADAMS Acting United States Trustee
 4                Region 2
 5    UNITED STATES DEPARTMENT OF JUSTICE
                      OFFICE OF THE UNITED STATES TRUSTEE
 6                    33 Whitehall Street
                      New York, New York 10004
 7
```

Page 2

~8145821.txt

              BY:    ANDREW D. VELEZ-RIVERA, ESQ.,
 8
                                                    of Counsel
 9

10

11           MICHAEL J. GARCIA, United States Attorney
             for the Southern District of New York
12
       UNITED STATES DEPARTMENT OF JUSTICE
13              OFFICE OF THE UNITED STATES ATTORNEY
       86 Chambers Street
14              New York, New York 10007

15           BY:    RUSSELL M. YANKWITT, ESQ.,
                    PIERRE G. ARMAND, ESQ.,
16
                           Assistant United States Attornies
17

18

19

20

21

22

23

24

25

                                                            4


 1    P R O C E E D I N G S:

 2              MR. ELLMAN:  Good morning, your Honor.

 3    Jeffrey Ellman from Jones Day on behalf of the debtors.  We

 4    have submitted our agenda for today and we're going to go

 5    roughly in order of the agenda, we might do maybe one out

 6    of order a little bit, but roughly in order of the agenda.

 7              The first two items have been adjourned, so

 8    we are really starting collectively items three and four.

 9    It's a short agenda, but we have some important matters,

10    and only one thing I believe is contested, which is at the

11    end of the agenda.

                           Page 3

~8145821.txt

12          The first two items we are very pleased to

13   bring before the court are the first motion that addresses

14   the fundamental commercial relationships that Dana has with

15   its customers.  These are Ford and Chrysler, which we are

16   going to do in that order, which is the opposite of the

17   agenda, if it's okay with the court.  At the next hearing

18   you'll see motions filed that relate to GM and Toyota.

19          As the court is aware, the customer

20   relationships are critical to Dana, to its business and to

21   its restructuring efforts.  And there has been a

22   longstanding effort in this case to address the customer

23   pricing and profitability issues, and I think the court is

24   somewhat aware of that.  But before we get into these two

25   motions, what I propose to do, if it is okay with the

                                                            5

1    court, is to go through a little bit of background as to

2    what Dana has been doing on the customer initiative in this

3    case to broaden the background to the two motions.

4               THE COURT:  Go ahead.

5               MR. ELLMAN:  Your Honor, some of this may

6    sound a bit familiar because you probably recall that some

7    of this was discussed in the labor trial, the 1113, 1114

8    matters, and there is some discussion of this also in the

9    disclosure statement, if your Honor has had a chance to

10   peruse that at all.  You may recall that Dana has been

11   looking at restructuring issues as for annual profitability

12   and improvement in the range of 405 to 540 million dollars.

13   And you may recall that there have been different

14   iterations of a sort of bubble chart describing the source

15   of this potential savings.  There were six basic buckets --

16               THE COURT:  Bubbles and buckets.
                              Page 4

~8145821.txt

17          MR. ELLMAN:  Exactly.  We have had the
18     overhead, we had the manufacturing footprint, the retiree
19     cost, the labor union and nonunion, as well as the vendors.
20     And of course the sixth one, which is what we are talking
21     about really today, is the customer, the pricing and
22     profitability of piece of this.  And that number that was
23     assigned to that piece, that bucket or what have you, was
24     175 to 220 million dollars, and those are the annual
25     savings being sought from customers.  It is obviously

                                                           6


1     critical, as you've heard I think more than once, the
2     returning U.S. operations to viability and long term
3     profitability.
4                The pressures that have been facing Dana in
5     the marketplace have been severe.  There have been
6     increasing commodity material costs, inflation of those
7     costs have been significant, and those are costs that are
8     hard to pass to the customers.  You've had pressures on the
9     OEM manufacturers, as the court I'm sure is aware, of the
10     loss of market share, continuous pressure to price down to
11     match prices from low cost countries, competitive pressure
12     in the market, and of course pressure for improvements of
13     productivity which also pressures to pass our savings on to
14     customers.  Volumes have been down.  The industry has
15     experienced soft sales market, less revenues for companies
16     like Dana, less ability to recoup capital costs from sales.
17                So all these sort of come together and
18     bring us to the point where profitability is an issue in
19     many customer programs.  So the process was put in place,
20     described to this court I think at least on one or two

~8145821.txt

21    occasions in the past, is to look at all the vehicle

22    programs, put them out on the table, take a hard look and

23    particularly focusing on one hundred of the programs

24    looking at I think four things in particular.  Strategic

25    importance of the customer, the need for a diverse customer

7

1    base, whether there are alternatives to the customers in

2    sourcing, and what is the history of price down; what is

3    the price of history with that particular customer?

4              So Dana developed what was, in their view,

5    the appropriate price and economic relief for each of the

6    customers.  We developed customer specific strategy as

7    opposed to a vague and broad strategy, but we targeted the

8    individual customers, and in the beginning of the summer of

9    2006, began to discuss the economics and pricing issues

10    with customers.

11              And as the court can I'm sure appreciate,

12    going to customers and asking for this kind of economic

13    relief is no easy feat.  The customers have long standing

14    and very broad relationships with Dana.  They have a great

15    deal of economic influence in the marketplace and they are

16    under their own pressures in the marketplace themselves.

17    So going into this environment and asking for this kind of

18    relief, which is already difficult to do, becomes more

19    difficult.

20              Nevertheless, Dana goes out and is looking

21    for the 175 to 225 million in annual, ongoing savings from

22    customers; they are going to Ford and Chrysler, both of

23    which are in front of the court today, GM, Toyota and other

24    customers.  So it's a very broad program and a lot of work

25    over many months.  And two of the people who were really

~8145821.txt

8

1    responsible in a very large way for that effort are here
2    today in the courtroom, and I would like to introduce to
3    the court, Robert Fesenmyer who is here.
4                    MR. FESENMYER:  Good morning, your Honor.
5                    THE COURT:  Good morning.
6                    MR. ELLMAN:  And he is the president of the
7    global business developed of Dana.  He's been at Dana for
8    over 30 years, and you have at least four declarations from
9    Mr. Fesenmyer on the four motions that are pending.  He is
10   the witness who would testify to the support of these
11   motions that are pending.
12                   And Ted Stenger, who is here, is the chief
13   restructuring officer of Dana, who I think the court is
14   familiar with.  He had testified to some of the background
15   on the customer programs in the past in connection with the
16   labor trial.  And he also was very much involved in the
17   discussions with customers.
18                   Now between Mr. Stenger and Mr. Fesenmyer
19   and a lot of other people engaging in meetings with these
20   customers, you start at the end of 2006 and the beginning
21   half of 2007 to reach agreements with customers.  And we
22   are starting to get some price relief, some of which is
23   being implemented immediately and some of which comes in
24   over time.  And then the fun part begins, which is
25   documenting those agreements, which in some cases have

9

1    taken a very long period of time.  But the effort was
2    ultimately well worth it.  And if you look at 175 to 225

~8145821.txt

3    million dollars that we are looking for in annual price

4    relief, economic relief from customers, what you end up

5    with is what we expect to be 180 million dollars in

6    annualized profit improvements from customers.  It's within

7    the range that we targeted, it will be an important

8    contribution to the restructuring, it will be an important

9    component of our going forward business.

10             So that's sort of the background leading us

11    to the Ford motion.  And the Ford motion, which is actually

12    agenda item four in your binder, seeks approval of a series

13    of four different agreements with Ford, commercial

14    agreements.  And this is an example of taking some time to

15    document these.  We had an agreement in principal reached

16    in December of 2006 with Ford, and these agreements were

17    signed in August and were promptly brought to the court for

18    approval after they were executed.  So obviously they

19    represent many months of hard work with the parties, and

20    allows us to continue to be a supplier of, and a business

21    partner with Ford for hopefully many years.  So Dana is

22    extremely pleased to be able to bring this to the court.

23             Now before we get into the actual details

24    of what are in these documents, I think there are a couple

25    of preliminary things I wanted to raise.  And one is I

10

1    think the most important one, which is that the specific

2    terms of these agreements and at least some of the

3    justifications that go behind the agreements, why they are

4    appropriate from a business perspective in its business

5    judgment had highly confidential and sensitive.  It brings

6    in pricing, it brings in other commercial terms and

7    conditions.

Page 8

~8145821.txt

8          So what we have done, and I think your

9    Honor is aware, is we have filed a declaration by Mr.

10   Fesenmyer, one of the declarations I referred to earlier,

11   under seal, with the Court's permission, which describes

12   the confidential or at least many of the confidential

13   business justifications for the transaction, and it does

14   attach the commercial agreements.  But the commercial

15   agreements and those confidential business justifications

16   are not in the public record and have not be included in

17   our motion.

18          So what we intend to do today is to talk

19   very briefly on the record about the non confidential

20   aspects of the settlement.  These are consistent with

21   what's in the motion we did file.  And our view is that

22   with that description, with the motion that's publicly

23   available, with the papers that the court has that have

24   been filed under seal that are available to your Honor and

25   that have been shared, of course, with the professionals

                                                          11

1    for the creditors' committee, we think there is sufficient

2    basis simply to take that in and to rule today.

3          If the court, for whatever reason it did

4    have specific questions, did want to talk more about the

5    terms of the agreements or wanted to ask questions of

6    counsel or of Mr. Fesenmyer about the contents of the

7    declaration that he would testify to if so asked, we would

8    request that that be done in camera either in chambers, or

9    clear the courtroom or what have you, but we are not

10   prepared to talk about those details in a public setting at

11   this point.

                         Page 9

~8145821.txt

12        The second point, just to mention so it's

13    clear what we are talking about today on Ford is that this

14    relates to the Ford frame business.  This relates to Dana's

15    sale of vehicle frames to Ford.  Dana has other businesses

16    with Ford selling axles and other parts to Ford, and we

17    have been negotiating with Ford on those programs as well,

18    and they are not part of what is in front of the court

19    today, and they may not be ever be presented to the court

20    because those are agreements, like some of our other

21    customer agreements, that were really ordinary course type

22    of settlements.  They didn't bring in other types of

23    agreements that would require court approval.  So we are

24    really talking about one piece of the Ford business which

25    is important but not the entire scope of the Ford business.

                                                        12

1         So, finally to the actual contents of what

2    we are asking the court to do today, starting by talking

3    about what Ford is; Ford is our largest customer; it's Dana

4    Company's largest customer.  It's also the largest customer

5    of Dana's structural solutions group, which is the part of

6    Dana that makes frames for Ford.  And those frames relate

7    to a number of programs; the F150 pickup, the F150 Heritage

8    truck, the Expedition Navigator Sport Utility Vehicle, the

9    previously produced frames for the Free Star Van and the

10    super duty truck.

11        There are a number of programs here at

12    issue.  Of these the most prominent and important one is

13    the Ford F150 pickup truck.  Dana has made frames for that

14    particular vehicle for 30 years, so it's been an important

15    Dana over the years, and because of all these programs,

16    that Dana based component of it, the sale of frames has

Page 10

~8145821.txt

17    been in the hundreds of millions of dollars on an annual

18    basis.

19             In the negotiations with Ford at the high

20    level there are basically three points, three topics of

21    discussion.  One was pricing for current programs, price

22    relief for things we are doing right now.  The second one

23    is ordinary course commercial claims for early termination

24    of programs to recoup capital costs that would have

25    otherwise been recouped through ongoing business where a

13

1    program was terminated early, for start up costs for new

2    programs; those types of plans.  And the third piece was

3    sourcing for the next generation of the F150 pickup truck

4    known as the P415 program, formalizing that sourcing and

5    pricing for that sourcing so that the price relief we are

6    getting to the current programs will continue into the

7    future with committed new business and committed pricing to

8    achieve that.

9             So those are the three basic sources of

10    what we are doing here.  On the P415 pickup truck, the

11    future business of that program runs, or projected to run

12    from 2008 through 2013.  So the per price relief at a

13    price, establishing a price, and other terms relating to

14    the ongoing business, we feel comfortable that the Ford

15    settlement does provide for an ongoing benefit to the

16    estate.

17             So to summarize the four agreements that we

18    have in front of the court, we have future pricing, we have

19    termination claims resolved, start up costs claims

20    resolved, we have an agreement for Dana to be the primary

Page 11

~8145821.txt

21    but not the sole source of the future F150 frames and under

22    the P415 program, the firm pricing agreements that forego

23    scheduled price downs in the future, and as part of

24    resolving all these appropriate releases between parties,

25    which is part of the reason that we are in front of the

                                                                14

1    court today, because that is something we need court

2    approval to do.

3              I think the key point out of all that, if

4    you add all that together, is the pricing increases and

5    commercial terms, all the things I just mentioned, are

6    going to allow now Dana to have an ongoing business with

7    Ford for the frame business that is going to be profitable.

8    We can make and sell the frames profitably which was not

9    true in the past.  In the past, most recently anyway, these

10   were programs that were not profitable.  And as I

11   mentioned, with the new P415 programs agreements on

12   sourcing and pricing, those benefits will continue beyond

13   this year into the future.

14             The ordinary course claims that were

15   settled, in Dana's view, the settlements were within what

16   we thought we were entitled to under those claims.  We

17   don't believe that there were any significant concessions

18   or give away's, we believe that they were fair settlements

19   of ordinary course claims.  The belief by Dana in their

20   business judgment is that they negotiated the best deal

21   that they can under the circumstances.  It is plainly

22   preferable from the debtors' perspective to the only other

23   available alternative really that was out there, which was

24   to say these were unprofitable programs we will reject the

25   agreements and walk away from this business.

                          Page 12

~8145821.txt

15

1          That alternative, I guess somewhat obvious,
2     but has several down sides, one of which is, of course,
3     substantial impact on our relationship with the customer
4     that does lots of other business with Dana besides this
5     substantial piece of business; lost business, which is, as
6     I mentioned, hundreds of millions of dollars of revenue a
7     year with really no place to replace it.  There is no real
8     prospect to replacing that business, and the possibilities
9     of a very large rejection damage claim which presumably
10    would be contested and that would lead to litigation, again
11    litigating with one of our longstanding customers which is
12    not a prospect that will give any benefit to the estate or
13    anyone else.
14          So you put it all together, your Honor,
15    settlement with our largest customer in a way that we think
16    is fair and appropriate allows us to move forward
17    profitably in the frame business with Ford.  We think this
18    will be one of the important cornerstones of the
19    restructuring, and therefore would ask for it to be
20    approved.
21          And my last culled point would be I guess
22    that the creditors' committee, as I mentioned before, has
23    been -- the professionals have been given copies of the
24    confidential material that the court also has, which is
25    filed under seal.  We've had meetings with the committee on

16

1     multiple occasions to talk about just some of the customer
2     issues.  My understanding is that the committee supports

Page 13

~8145821.txt
```
 3    the relief, and they will tell what their position is
 4    themselves, but my understanding is they support the
 5    relief, and we have had no objections to the proposal.
 6              So in our view there is no reason to not
 7    approve this and we would ask the court, again, to sign the
 8    form of order that will attend to it.
 9              THE COURT:  Does anyone want to be heard?
10              I may also note that there are two
11    witnesses present in the court available for inquiry, if
12    anybody wants to make inquiry.  Does anyone want to be make
13    inquiry?
14              There's no response.
15              MR. MAYER:  The committee supports the
16    debtors, your Honor.
17              THE COURT:  Very well.  The court has
18    reviewed the documents filed under seal pursuant to Section
19    107(b)(1), which is appropriate applied, especially in
20    situations such as this.  It may very well be that that's
21    the reason that 107 was put into effect and then
22    embellished afterward.  But I do find that the business
23    judgement standard has been met and certainly this grand
24    pass is a best interest test and I will approve it.
25              MR. ELLMAN:  Thank you, your Honor.  If I
```
                                                        17

```
 1    might approach?
 2              THE COURT:  Yes.
 3              I've signed the order.
 4              MR. ELLMAN:  Thank you, your Honor.
 5              MR. FEINSTEIN:  Good morning, your Honor.
 6    Robert Feinstein of Pachulski Sang Ziehl and Jones.  We are
 7    conflicts counsel to debtors and debtors in possession.  My
```
                          Page 14

~8145821.txt

8  task as conflicts counsel today is to present the Chrysler

9  motion.  In as much as Chrysler is a Jones Day client, we

10 handled this matter along with the same personnel of the

11 company, Mr. Fesenmyer and Mr. Stenger.

12            As Mr. Ellman described to the court,

13 settlements with customers such as Chrysler are a critical

14 part of the debtors' restructuring efforts.  And the

15 company faced the same challenges in the Chrysler

16 discussions as it did with Ford in terms of attempting to

17 negotiate major economic concessions from major customers

18 like Chrysler.  Chrysler is one of the debtors' five

19 largest customers.  Historically Dana has produced and

20 produces axles and prop shafts for Chrysler which we

21 referred to in the motion collectively as component parts

22 that are used in Chrysler sport utility vehicles.

23            As with Ford, this represents hundreds of

24 millions of dollars of business annually for the Dana

25 Companies, and all the same concerns and economic pressures

                                                    18


1  affected this relationship as with Ford.

2            Also the Dana Companies purchase axles from

3  Chrysler, which presents some unique circumstances in that

4  there --

5            THE COURT:  You mean you sell them and then

6  buy them back?

7            MR. FEINSTEIN:  No.  Actually Dana buys

8  axles from Chrysler and then incorporates them into

9  components which are then used in vehicles.  That's my

10 understanding.

11            THE COURT:  And resold to another OEMs?

~8145821.txt
12            MR. FEINSTEIN:  I don't think so.  I think

13    back to Chrysler is my understanding.

14                    So there are liabilities going in both

15    directions.  And one of the matters resolved by the

16    settlement, apart from the pricing and other concerns that

17    were addressed in the Ford situation, is a prepetition

18    agreement between Dana and certain of its affiliates and

19    Chrysler with regard to setoffs that essentially permitted

20    tri parte setoffs where Dana was owed money by Chrysler,

21    Chrysler was owed money by a Dana affiliate.  And this

22    agreement purported to give Chrysler the right to offset,

23    among the various obligations with respect to these Dana

24    parties.

25                    Prepetition an issue arose as to whether

19

1    Dana Corporation had authority to enter into that setoff

2    agreement on behalf of its subsidiaries.  It's one of the

3    issues that's resolved by the settlement.  Also Chrysler

4    filed a number of proofs of claims in the case; 715

5    thousand for axles that were sold by Chrysler to Dana

6    Companies, 75 thousand dollars for warranty claims, and

7    then unliquidated claims for warranty issues.

8                    As with Ford, the debtors determined that

9    it was necessary to approach Chrysler and try to negotiate

10    price concessions as part of the overall restructuring

11    effort.  And what ensued was a lengthy series of meetings

12    between representatives of the debtors, representatives of

13    Chrysler, and this culminated in the settlement agreement

14    which is attached to the Fesenmyer declaration that, with

15    the court's permission, was filed under seal.  And that

16    agreement reflected months of hard work and effort to

Page 16

~8145821.txt

17     resolve the pricing issues, the issues surrounding the

18     setoff agreement.  And as a result of that agreement, Dana

19     is now positioned to continue as an important supplier to

20     Chrysler for years to come.

21                    As with the Ford agreement, there are quite

22     a number of sensitive business matters reflected in the

23     settlement agreement, so that it has been filed under seal.

24     And I would highlight the non confidential terms on the

25     record and offer once again, that if your Honor has

                                                            20

1     questions about the proprietary aspects that we either do

2     that in camera or clear the courtroom.  But on a public

3     level, the settlement agreement has significant pricing

4     changes for the benefit of Dana, some of which are

5     retroactive to earlier this year, the rest of which are

6     prospective and provide considerable economic benefits to

7     Dana going forward.

8                    The agreement also has Dana assuming the

9     setoff agreement that will resolve the controversy

10     surrounding that agreement and assuming other existing

11     purchase orders whose terms weren't modified, but all of

12     these purchase orders going forward now provide Dana with

13     an economically viable platform for the various Chrysler

14     programs that it's party to.

15                    The settlement agreement also provides for

16     the withdrawal of the various proof of claim that Chrysler

17     filed with the caveat that prospective warranty claims are

18     not being released or discharged.

19                    And finally, as with Ford, there is an

20     exchange of mutual releases, save for the obligations that

Page 17

~8145821.txt

21     are set forth in the settlement agreement. And that would

22     include a release of any Chapter 5 claims against Chrysler.

23               The benefits of the agreement as reflected

24     in the Fesenmyer declaration are quite considerable to the

25     debtors, and the settlement avoids protractive litigation

                                                  21

1     over the setoff agreement, and obviously allows Dana to

2     move forward in an economically viable position on these

3     programs.

4               The debtors submit that the motion

5     satisfies the requirements of Section 363 as it's founded

6     on business judgment, all the reasons set forth in the

7     Fesenmyer declaration, as well as the standards for a 9019

8     settlement, in that the price increases are considerable,

9     the avoidance of litigation is beneficial to the debtor,

10     and the debtors believe that the negotiated terms of the

11     pricing and other terms of the settlement agreement are as

12     favorable as they could have obtained through these

13     negotiations.

14               As with the situation with Ford, the

15     alternative was to reject these various customer programs

16     and purchase orders. The debtors would have been faced

17     with the same parade of horribles that Mr. Ellman itemized,

18     which would have been negative impact on a relationship

19     with a large customer, potentially large rejection claims,

20     and litigation over those claims as well.

21               By contrast, the settlement puts the debtor

22     into an excellent position to work with Chrysler going

23     forward on a profitable basis. As with the other

24     settlement, the settlement agreement is the product of

25     substantial arms length negotiations, and it is another

~8145821.txt

1    important cornerstone in the debtors' restructuring
2    efforts.
3              Once again, the debtors kept the committee
4    apprised of its progress.  The committee advisers have had
5    access to the confidential information that's been provided
6    to the court, and we understand that the creditors'
7    committee has no opposition to the motion and no objections
8    to the motion have been filed.  Accordingly, we ask that
9    your Honor grant the debtors' motion and sign the proposed
10   orders that we've submitted.
11             THE COURT:  Here again, Messrs. Fesenmyer
12   and Stenger are in court.  Does anyone want to make inquiry
13   of them?
14             There is no response.  Your request for
15   relief is granted.
16             Here, too, I note that this is an
17   appropriate result under a business judgment standard, and
18   it also passes the best interest test and I will approve
19   it.
20             MR. ELLMAN:  Thank you, your Honor.  We
21   will submit the order at the conclusion of the hearing.
22             MR. ENGMAN:  Good morning, your Honor.
23   Richard Engman of Jones Day a behalf of the debtor.
24             Your Honor, I'm here this morning asking
25   for approval and authority for the debtors to enter into an

23

1    amendment to their purchase agreement with Coupled Products
2    LLC for the sale of their coupled products business.

~8145821.txt

3        Your Honor may recall that the original

4   purchase agreement for the coupled products business was

5   approved in conjunction with the debtors' sale of its

6   overall fluids business.

7            On June 6th, to back up a little, this was

8   the third of the three groups of non core assets that the

9   debtors have sold throughout the case, in addition,

10  starting with trailer axles and engine hard products, in

11  March, your Honor, we filed a motion seeking authority to

12  approve bidding procedures for the auction and sale of the

13  fluid products business.  Your Honor approved those bidding

14  procedures, and on June 4th we had an auction with

15  effectively two stalking horses.

16           The debtors were unable to get a single

17  buyer for all of the assets of the fluid products business,

18  and instead the best offers for stalking horse purposes was

19  an offer for certain of those assets at 75 million.  We

20  were, at the time, happy to report that -- excuse me, 70

21  million.  At the auction that group of assets was bid up,

22  and ultimately were the successful bidder at the auction

23  was in exchange of a purchase price of 85 million.

24  Unfortunately on the Coupled Products side there were no

25  other bidders except for the stalking horse bidder.

                                                    24

1            Your Honor may recall that the coupled

2   products business, the assets related to the coupled

3   products business historically have caused significant

4   operating losses for the debtors.  Last year it was in

5   excess of 30 million.  The debtors believe that if they

6   were required to shut down that business they would also

7   incur significant losses.  There is also union issues and

                        Page 20

~8145821.txt

8    the like, which was the rationale and business judgment for

9    the debtors accepting the offer from Coupled Products LLC,

10   which was on its face a normal one dollar purchase price,

11   however, it also had a working capital adjustment that the

12   net effect of which would be that the debtors had expected

13   to pay Coupled Products about 10 million dollars to acquire

14   and take the liabilities associated with these assets.

15         Since that auction, since the order was

16   entered, the debtors and Coupled Products LLC have been

17   working to satisfy the various closing conditions in the

18   asset purchase agreement.  The debtors believe, let me back

19   up one more time.  Your Honor will note that our motion was

20   filed, today's motion was filed both under Section 363 and

21   Section 9019.  The reason for that, your Honor, is that the

22   debtors do believe that all of the closing conditions under

23   the original purchase agreement have been satisfied.

24   Unfortunately, Coupled Products, the proposed buyer,

25   disagrees.

25

1         We have negotiated and discussed the matter

2    with Coupled Products.  While we do believe that all the

3    closing conditions have been satisfied, we don't believe

4    that establishing that in requiring specific performance

5    from Coupled Products could be done quickly or easily.

6    Coupled Products, as I said, maintains that the closing

7    conditions have not been satisfied; that, among others,

8    certain contracts needed to be -- they needed to reach

9    agreements on certain contracts to their reasonable

10   satisfaction.

11         There is also a portion of the business

~8145821.txt
12    that we refer to as the ITAR assets that the U.S. State
13    Department has, and those assets are products that the
14    business produces for military vehicles.  The state
15    department has said that they wouldn't sign off on the sale
16    to the buyer if it included those assets.  The debtors
17    believe that those assets are a small portion of the
18    business and not material, and that they could nevertheless
19    require the purchaser to close.
20              Notwithstanding that, as I stated, the
21    purchaser disagrees, which brings us to where we are today,
22    which is in the debtors' reasonable business judgment we
23    believe settlement of these issues rather than a litigation
24    and an attempt to require specific performance from the
25    purchasers is in the debtors' best interest.  Under the

26

1    amendment the buyer agrees that all of the closing
2    conditions under -- the relevant closing conditions under
3    the purchase agreement have in fact been satisfied.
4              The debtors and the buyer agree to work
5    together to satisfy some of the buyer's other concerns.
6    And most importantly for the debtors, the buyer agrees to
7    close within two days of your Honor entering an order
8    approving the amendment.
9              The cost of the amendment to the debtors,
10    your Honor, is the debtors have agreed to increase the
11    networking capital adjustment, so that we believe that the
12    net effect of this purchase will, by another five million,
13    make the net effect about 15 million going to the buyer.
14    Mr. Richard Morgner of Miller Buckfire, who is in the
15    courtroom, your Honor.  He was the debtors' lead investment
16    banker.  He could testify to the facts stated in the motion
Page 22

~8145821.txt

17    and to the debtors' business judgment as to why they

18    believe that entering into this amendment is the right

19    course of action and that closing this transaction on the

20    amended terms is in the best interest of the debtors and

21    their estates.

22              THE COURT:  Does anyone want to be heard

23    with respect to the proffer?  Does anyone want to examine

24    the witness?  Does anyone want to be heard with respect to

25    the transaction?

27

1              MR. MAYER:  The committee's professionals

2     have looked at this in some detail, your Honor, and we

3     support the relief requested.

4              THE COURT:  I'm a little bit troubled,

5     because this is being modified based upon a resolution of

6     legal issues as to whether or not the other party to the

7     transaction would be required to close.  And now that

8     closure is taking place at a further expense of some five

9     million dollars.

10             Who's operating this business at this time?

11             MR. ENGMAN:  The debtors are, your Honor.

12             THE COURT:  And has the business been

13    sustaining losses during this period of time?

14             MR. ENGMAN:  Significant losses, your

15    Honor.

16             THE COURT:  So that we are dealing with

17    more than five million dollars going the other way?

18             MR. ENGMAN:  Substantially.

19             THE COURT:  What does significant mean?

20             MR. ENGMAN:  Your Honor, we believe that if

Page 23

~8145821.txt

21    litigated the potential losses of either attempting to shut

22    down this business or maintaining the operations so that

23    specific performance could happen at the end of the

24    litigation would far exceed the five million and I think be

25    in the 20 to 30 million dollar range.

28

1                    A VOICE:  The business is losing two

2    million a month right now.

3                    MR. ENGMAN:  The business is losing two

4    million a month right now, your Honor.

5                    MR. MAYER:  Your Honor, there are other

6    issues about the availability of specific performance

7    relief that I don't think is appropriate to go into here.

8    Suffice to say that although the committee is not happy

9    about watching the price of getting out of this business go

10   up, we were convinced that, after a fair amount of due

11   diligence of our own, looking into the competing

12   allegations as to whether or not there was a breach,

13   whether or not performance could be compelled, whether or

14   not remedies really were available against the buyer, and

15   the degree of operational losses that would be sustained,

16   we did believe that this made some sense.

17                    THE COURT:  This buyer appears to have very

18   significant advantage and benefit over other parties in

19   interest or potential purchasers in that it's achieved a

20   CIFIUS approval, which is very hard to come by to be a

21   qualified purchaser.

22                    MR. MAYER:  Your Honor --

23                    MR. ENGMAN:  Your Honor, as debtors'

24   counsel it's a little harder for me to state the other

25   side's case, but I don't want to overstate ours either.

Page 24

~8145821.txt

⚥

29

1          One of the reasons that CIFIUS approval has
2      been granted is because of the removal of the ITAR assets,
3      and the ITAR assets are not excluded assets in the original
4      agreement.  It's a little unclear that while we maintain
5      that we could force closing, notwithstanding that we would
6      not be delivering all the of the assets that were provided
7      for in the original agreement, I don't know that the court
8      would ultimately make the same conclusion.
9          Candidly, your Honor, while we thought it
10     was a better deal the way that it was, we still believe
11     that no other party before or after was willing to acquire
12     these assets and these liabilities for any like amount, and
13     we believe that it is in fact the best deal that the estate
14     can get or would get.  And accordingly, it remains in the
15     best interest of the estate.
16                   THE COURT:  when is closing supposed to
17     take place?
18                   MR. ENGMAN:  we've asked for within two
19     days.  And as a consequence, the proposed order, your
20     Honor, asks for a waiver of the ten day automatic stay.
21     It's set to close Friday.
22                   THE COURT:  well, in view of the specter of
23     on going losses while the debtor maintains possession of
24     these assets and based upon this record, I do find that it
25     just gets over the line with respect to being within the

⚥

30

1      zone of reasonableness.  And given that the creditors'
2      committee has done it's due diligence and is supporting the

```
                              ~8145821.txt
```
3    transaction, I will approve it.

4                      MR. ENGMAN:  Thank you, your Honor.  If I

5    can approach I do have a proposed order.

6                      THE COURT:  Yes.

7                      MR. ENGMAN:  There's one change from the

8    order that was attached to our motion, and that that's

9    simply in paragraph 3.  One of the assets being sold is the

10   name Coupled Products.  And as a consequence, we are asking

11   for express authority to change the debtors' name from

12   Coupled Products LLC to CP Products LLC.

13                     THE COURT:  Duly noted.  I've signed the

14   order.

15                     MR. ENGMAN:  Thank you, your Honor.

16                     MR. ELLMAN:  Your Honor, Jeffrey Ellman

17   again on behalf of the debtors.  Moving on with the agenda

18   to item 6, which is a retention application for Cushman and

19   Wakefield of Oregon, Inc. to serve as appraisers for the

20   debtors.  These will be real property appraisers.  It's

21   also seeking approval of Cushman and Wakefield's fee

22   structure.

23                     This is the second in sort of a three part

24   series of these retentions.  You may recall, and these

25   relate to fresh start accounting, your Honor.  You may

                                                              31

1    recall that on August 22nd the Court approved retention of

2    Hilco to do personal property appraisal services; that

3    again was approved by a court order on August 22nd.

4                      Cushman and Wakefield, which is before the

5    court today, will be the real estate appraisers for fresh

6    start accounting, and Ernst and Young, which is already a

7    retained professional in the case, along with their other

                              Page 26

~8145821.txt

8     roles, would expand the scope of their retention to take

9     the lead sort of the lead role in coordinating fresh start

10    accounting.  And we expect that an application to do that

11    with respect to Ernst and Young will be filed in the near

12    term.  It has not yet been filed.

13              I believe at the last hearing where we

14    talked about Hilco, we described briefly the fresh start

15    accounting needs, so I won't belabor that.  But fresh start

16    accounting principals are to be applied to qualifying

17    debtors upon emergence from Chapter 11.  And under those

18    circumstances, the debtor will have to allocate its

19    reorganization valued assets and liabilities that will

20    include doing real property appraisals prior to emergence.

21    And as the court is aware, the debtors are pursuing

22    vigorously emergence by the end of the year, if possible,

23    and therefore this is an appropriate time that we need to

24    have the fresh start accounting up and running.

25              Cushman and Wakefield is the largest fully

32

1     integrated real estate valuation organization in the world.

2     I don't think there should be any issue about their

3     qualifications to do the job.  One thing to mention, which

4     is very similar of what was presented to the court on

5     Hilco, is that Cushman and Wakefield through an affiliate

6     did provide services to Citigroup, one of the Citigroup

7     companies prepetition to do real estate appraisals for DIP

8     financing purposes.  That engagement is done at this point.

9     They are not continuing to have that role for Citigroup.

10              But it does mean that they are familiar,

11    they have already done appraisals for about 40 percent of

~8145821.txt

12    the properties at issue here.  There are no conflicts in

13    our belief because the appraisals are for different

14    purposes.  In the financing context these were orderly

15    liquidation valuations for financing.  Here we have fair

16    market valuations for the fresh start accounting.  Again,

17    this is similar to we did with Hilco.

18              That background allows Cushman and

19    Wakefield to bring to bear some efficiencies that will

20    allow the fee to be much lower than it otherwise would have

21    been.

22              We also have retained previously in the

23    case Signature Associates, which is a real estate

24    consultant.  And they have done some analyses of property

25    and some market studies, I guess is what you could call

                                                        33

1     them.  Cushman and Wakefield can rely, for some of the

2     properties, on those market studies as well.  So that we

3     are trying to the take advantage of the services that have

4     been prepared or performed in the past and not duplicating

5     effort, again, achieving some efficiencies in value.

6              At the end of the day what Cushman and

7     Wakefield will perform is a fair valuation of certain

8     properties, about 13 fiscal on site valuations and about 69

9     desktop appraisals, and then reviewing about 17 of these

10    market studies just for reasonableness that have already

11    been concluded, and then in 60 days the debtors will get a

12    report.

13              Between Cushman and Wakefield, Hilco and

14    Ernst and Young, the roles are well defined.  We don't

15    believe there will be duplication.  We believe the

16    affidavit submitted with the application demonstrates that

~8145821.txt

17     there is not a conflict or disinterest in this problem.  We

18     do have a person that enquired about Section 327.

19                    The fee is a flat fee of 300 thousand

20     dollars; that includes expenses.  Again, we think that is

21     much lower than it would have been given the circumstances.

22     There are limitation of liability and indemnity provisions

23     in the engagement, and they have the standard carveouts and

24     limitations that we have seen before in other engagements

25     that the court requires carveouts for bad faith, self

                                                        34


1     dealing, gross negligence, misconduct, any kind of

2     indemnity has to come to the court, any attorneys fees that

3     they might seek would have to come before the court.  And

4     the payment of fees are, of course, subject to court review

5     and subjection to Section 330 review by the committee and

6     the U.S. Trustee.

7                    I had a brief conversation with the U.S.

8     Trustee before the hearing.  My understanding is that they

9     have no objection to this retention, and we would ask that

10    it be approved in the form of an order.

11                    THE COURT:  Does anyone want to be heard?

12                    The application is granted.

13                    MR. ELLMAN:  Thank you, your Honor.  If I

14    might approach?

15                    THE COURT:  Yes.

16                    I've signed the order.

17                    MR. FEINSTEIN:  Your Honor, if I might

18    approach at this point and hand up the Chrysler order as

19    well?

20                    THE COURT:  I'll entertain it.

                          Page 29

~8145821.txt
21          I've approved the Chrysler order.

22          MR. ELLMAN:  Thank you, your Honor.

23          There are two items left on the agenda.

24   Item number 7 is not going forward today.  This was claims

25   matter that I think the court had some conversations about

                                                              35

1    at a prior hearing.  There was one remaining claim on this

2    omnibus objection relating to stock ownership by a

3    gentleman named Stephen Clausen.

4          The debtors are withdrawing this objection

5    without prejudice.  We have determined that from the

6    information that he has provided in his claim, it does not

7    fit within this objection, and it might yet been

8    objectionable.  For the reasons it's not a large dollar

9    amount claim, we are going to determine whether it is

10   appropriate at some later date to object to it or not.  But

11   for purposes of this objection we are going to withdraw the

12   objection.

13          THE COURT:  Marked withdrawn.

14          MR. ELLMAN:  Thank you, your Honor.  And

15   that brings us to the last item on the agenda, which is the

16   debtors' motion to establish the estimation procedures for

17   the claims of the U.S. Environmental Protection Agency and

18   the National Oceanic Atmospheric Administration of the

19   Department of Commerce and the Department of the Interior.

20   I see them coming up here.

21          I will just do a brief introduction.  I

22   have some colleagues here who will take the lead on this,

23   but this is a matter of ongoing importance to our plan

24   process.

25          As the court is well aware, the debtors
                              Page 30

~8145821.txt

36

1    have objected to the claims of the government entities.  I
2    mentioned, they relate to six Superfund sites.  They are
3    very significant unliquidated contingent claims but they
4    could be as much as 300 million dollars going to the
5    government.  So we have to advance the plan process, and
6    for various reasons I'm sure we will discussed here and are
7    annexed in our papers, determine that we do need to move
8    forward with an estimation of the claims based upon the
9    objections that we have.  And we are prepared to do so
10   diligently and we would like to have that done by the end
11   of the year to permit our emergence and payment of
12   creditors on the schedule.
13                   On in getting prepared we have with us, I
14   will introduce to the court, the team of lawyers who
15   focused on this and will continue to focus on this project,
16   Steve Bennett, who is our litigator sitting here at counsel
17   table, who I believe is familiar with the court from prior
18   litigation in this case, and also now at counsel table
19   Kevin Holewinski from our Washington D.C. office is an
20   environmental lawyer.
21                   And if it please the court, I'll turn it
22   over to Mr. Bennett to discussion the motion.
23                   MR. BENNETT:  Good morning, your Honor.
24                   THE COURT:  Good morning.
25                   MR. BENNETT:  Steven Bennett from Jones

37

1    Day.  And as Mr Ellman mentioned, Mr. Holewinski from our
2    Washington office.  I think his pro hac vice motion has

Page 31

~8145821.txt

3    been approved, I think he is admitted as well for purposes
4    of this matter.
5                    MR. HOLEWINSKI:  Correct.
6                    MR. BENNETT:  The real question here is one
7    of convenience of the court as to whether it is possible to
8    conduct this estimation hearing on the schedule that we've
9    proposed.  Basically any time after December 4th, we would
10   be available to conduct that hearing.  The form of the
11   hearing is also subject for the Court's discretion, but we
12   anticipate that it's conceivable to conduct the hearing in
13   a single day, perhaps a little bit more than that.
14                   But it is an estimation hearing rather than
15   a full scale trial.  As the court may well appreciate,
16   there is a good deal of flexibility associated with
17   estimation proceedings, and we would propose that the court
18   first tell us, we would hope, the availability for that
19   hearing, and then we would work backwards from that
20   schedule.  We have started with the assumption that the
21   hearing could be conducted in December and have worked a
22   schedule on that basis.
23                   The government opposes and proposes
24   essentially that the hearing not take place on until, at
25   the very earliest, March of 2008.  We think that's a non

                                                          38

1    starter.  As the court is well aware, we have a plan
2    support agreement in place that is the result of extensive
3    negotiation connected to the labor proceedings, and is
4    related also to the financial support for the plan.  That
5    basically calls for a completion of the plan process and
6    implementation of the plan by the end of February.  In
7    order to do that, and in order to meet the expectations of
                              Page 32

~8145821.txt

8      customers and vendors and other constituents involved in

9      the case, we basically need to have a hearing on this

10     estimation matter sometime by the end of the year, perhaps

11     very early into the new year.

12              So, from our perspective, it is entirely

13     feasible to conduct such a hearing.  The fact is that the

14     matters at issue factually may be somewhat difficult, but

15     the essential estimation process, which is to lay out for

16     the court what the potential exposure is and then to

17     itemize the points of allocation, divisibility, and

18     essentially make some sort of risk analysis as to the

19     potential exposure for the estate.  That is a very familiar

20     process, and we think it is one that is well within the

21     competence of this court.

22              Now the complicating factor here is, from

23     the government's perspective, they have filed a motion to

24     withdraw the reference.  We were in front of Judge

25     Scheindlin just yesterday on that subject.  She is going to

                                                                39

1      hear that question at the end of October.  That's the

2      schedule that she set based on her availability.

3               They have also filed a motion for stay

4      pending that determination by the District Court.  We think

5      that's a non starter as well, to wait until the end of

6      October to find out whether we are going to go ahead with

7      this process we think makes no sense.

8               Instead, what we propose is that there be a

9      schedule in place.  If at some point there is justification

10     before this court for modification of the schedule, that's

11     always possible to entertain.  If at some point Judge

                            Page 33

~8145821.txt
12    Scheindlin makes this determination on the withdrawal of
13    reference aversely, and we think there is a very good case
14    for our position that is not a matter of mandatory
15    withdrawal, and we have demonstrated to the court with the
16    CERCLA briefing, that the government has in other recent
17    cases proceeded in bankruptcy court through the estimation
18    process for CERCLA claims.
19                    But if, on that sort of worst case
20    scenario, somehow the matter does end up in district court,
21    that would mean that at very least we have a head start on
22    the process.  We would have initiated the process, and
23    conceivably could follow that same schedule or have some
24    modification at that point.
25                    In short, your Honor, it's our view that

                                                                40

1    there's no reason at this point to delay determination of a
2    schedule.  There's certainly no reason to start with the
3    assumption that the schedule calls for a hearing in March
4    as opposed to whatever the earliest convenience of the
5    court is in December, largely because picking March
6    immediately blows the plan support agreement, and also will
7    bash the expectations of customers, vendors and others
8    involved in the process.
9                    That all said, your Honor, my understanding
10    is that the creditors' committee has reviewed the matter
11    and they are in support.  The ad hoc committee of bond
12    holders had also filed a short statement in support.
13                    And with that, your Honor, I believe we
14    have a form of order available, but I'm sure you want to
15    hear from the government and from the creditors.
16                    MR. MAYER:  who would you like the to speak
                              Page 34

~8145821.txt

17    first?
18                      THE COURT:  Support/pro.
19                      MR. MAYER:  I am in support, your Honor.
20                      And I think it's appropriate for the
21    creditors to indicate their view on this matter.
22                      This is a site the debtors haven't owned
23    for 50 years and they haven't operated for 70.  In the
24    debtors' disclosure statement there is an indication as to
25    the total amount that's been reserved for environmental

                                                              41

1     damages on its properties is 15 and a half million dollars.
2     That's it.  When the government filed its claims for over
3     300 million dollars we were thunderstruck.  This came out
4     of nowhere for a property the debtors haven't owned for 50
5     years or operated for 70.
6                      The notion that this claim would delay this
7     case to March, with its concomitant damages of the estate
8     we find profoundly troubling, and would ask your Honor to
9     so order.
10                      MR. YANKWITT:  Good morning, your Honor.
11    Russell Yankwitt and Pierre Armand with the U.S. Attorney's
12    Office.
13                      We agree with Mr. Ellman and agree to work
14    diligently to resolve this case; however, the schedule that
15    they proposed is virtually impossible to comply with.  The
16    schedule does not allow sufficient time for depositions, it
17    doesn't allow time for third party discovery, it doesn't
18    allow time for in limine motions.  There are many complex
19    issues before this court and Judge Scheindlin on joint and
20    sole liability, on divisibility, on allocation of damages.
                            Page 35

~8145821.txt

21   These are going to require in limine motions which then may
22   or may not be appealed to the district court.  The schedule
23   that they provide for is just not workable.
24               With respect to the argument made that we
25   shouldn't wait until October, until the end of October to

42

1    have a scheduling conference, let me explain to the court
2    that between now and the end of October the parties will
3    actually be very busy on this matter, we will be briefing
4    the withdrawal motion before Judge Scheindlin, we will be
5    responding in particular to their opposition motion, we
6    will be responding to the claim in this court which we are
7    not asking for a extension on.
8               The government has already been
9    voluntarily, without a court order, without document
10   requests, been producing documents to Dana on an ongoing
11   basis.  We will continue to do that.  We are going to have
12   settlement discussions both as to the non CDE, which is the
13   New Jersey site.  There are six other sites throughout the
14   country that we are hopefully going to resolve.  We are
15   also going to resume some discussions on the CDE site.  All
16   this will happen between now and October.  So the parties
17   are very busy.
18               Furthermore, we are going to appear before
19   Judge Scheindlin potentially on October 3, depending on how
20   your Honor rules on our stay motion.  At that point the
21   judge could also give us a discovery schedule as well.  So
22   we are not waiting to the end of October to begin work.
23               For a brief moment, your Honor, of
24   background.  The government filed its proof of claim more
25   than one year ago.  We were operating under the assumption

~8145821.txt

43

1      that debtors were going to reserve the entire amount, the
2      300 million dollars amount, and that after they emerged
3      from bankruptcy, we would then have a trial before your
4      Honor or the district court judge, to resolve the true
5      amount of the CERCLA claims.
6              The debtors changed their mind, which they
7      are entitled to do.  But to try to cram this down in two
8      months when there are these incredibly complex issues, both
9      factually.  Yes, they haven't used or operated the property
10     in more than 50 years, but under CERCLA that's irrelevant.
11     They are still liable.  We need to go back over 70 years,
12     80 years in terms of factual knowledge, in terms of taking
13     depositions, interrogatories.  It's impossible to be done
14     with that in two months, your Honor.
15             We think it makes sense to wait and see
16     what your Honor's determines on the stay motion and what
17     Judge Scheindlin determines on the withdrawal motion and
18     proceed accordingly.
19             Alternatively, we have proposed a schedule
20     to your Honor which is aggressive, is ambitious, and we
21     will do our best to comply.
22             Thank you.
23             THE COURT:  Does anyone else want to be
24     heard?
25             MR. BENNETT:  No, your Honor.  I think the

44

1      short of this on the necessity for it is obvious to the
2      court.  You are well aware of the plan support agreement,

Page 37

~8145821.txt

3   would that we could have operated on this casual basis for

4   determination of this claim, it was simply not the case at

5   this point that we have the luxury of time.  We need to

6   have certainty, relative certainty as to the exposure here

7   to move the plan process forward.  That's why it's

8   essential.

9          From our perspective, at least, having a

10   schedule at this point will move the parties into the

11   formal discovery beyond whatever voluntary exchange may

12   otherwise occur.  And if at some point there is a need for

13   modification either before this court or ultimately on this

14   worst case scenario that Judge Scheindlin takes it up in

15   district court, we won't have lost of the better part of a

16   month in not pursuing that process.

17          THE COURT:  Well, first I note that both

18   parties have proposed aggressive discovery schedules, which

19   in some respects undercuts many of the government's

20   positions because they seem to be amenable to a very

21   aggressive schedule, and that includes getting to it right

22   away.

23          With respect to the matters before Judge

24   Scheindlin, whatever determines there determines, but in

25   both instances, whether it's here or there, an aggressive

45

1   schedule is called for.  And I do note with respect to the

2   schedule that the matters at issue, they, even as pointed

3   out in the government's papers before me, are essentially

4   factual.  So, I am constrained to grant the debtors'

5   application for the following reasons:  Before me I have

6   the motion (the "Estimation Motion") of Dana Corporation

7   ("Dana") and forty of its domestic direct and indirect

Page 38

~8145821.txt

8      subsidiaries, as debtors and debtors in possession for the
9      entry of an order to establish procedures for the
10     estimation of certain environmental claims pursuant to
11     Section 502(c) of the Bankruptcy Code, 11 U.S.C. Sections
12     101 through 1532 (the "Bankruptcy Code"), and Rule 9014 of
13     the Federal Rules of Bankruptcy Procedure (the "Bankruptcy
14     Rules").  The relevant claims are proof of claim number
15     13796 ("Claim 13796") filed for an unliquidated amount
16     against Dana filed collectively on behalf of the United
17     States Environmental Protection Agency ("EPA").  The
18     National Oceanic and Atmospheric Administration of the
19     United States ("NOAA"), the Department of Commerce ("DoC")
20     and the United States Department of the Interior acting
21     through the Fish and Wildlife Service (collectively the EPA
22     and DoC, which we will call the "Government") and proof of
23     claim number 13321 filed on behalf of the EPA in an
24     unliquidated amount against the Debtor Break Systems, Inc.
25     ("Claim 13321" and, collectively with Claim 13796, the

                                                              46

1      "Claims").
2                      The government seeks to recover 300 million
3      dollars in past and future costs to clean up six different
4      Superfund sites that were allegedly owned and/or operated
5      by Dana during the time that hazardous substances were
6      disposed of there, or at which Dana arranged for disposal
7      of hazardous substances, over the past 100 years.  The
8      claims relating to the site in South Plainfield, New Jersey
9      account for most of the 300 million dollars, with 65
10     million dollars relating to the other five sites.  The
11     debtors assert that the Claims are substantially overstated

~8145821.txt
12    and should be disallowed entirely, or reduced.  On

13    September 6, 2007, the Debtors filed the Estimation Motion

14    (See ECF Docket number 6112).  On September 7, 2007, the

15    Debtors filed an objection to the above referenced proofs

16    of claim.  (See ECF Docket number 6128).  The Government

17    filed an objection to the estimation motion.  The Official

18    Committee of Unsecured Creditors and the Ad Hoc Committee

19    of Note Holders, collectively, with upwards of 3 billion

20    dollars at stake in these cases, or possibly much more,

21    filed joinders to the Estimation Motion.

22                The background is that at the time of the

23    filing of the cases, the Debtors showed liabilities of 7.6

24    billion dollars and employed more than 45 thousand people

25    and are a substantial factor in a major industrial segment

47

1    of the United States.

2                On August 31, 2007, the Debtors filed their

3    joint plan of reorganization (the "Plan") and are pursuing

4    confirmation of the Plan and their goal of emerging from

5    Chapter 11 before the end of 2007.  The Plan includes a

6    plan emergence condition requiring that the total amount of

7    allowed general unsecured claims in certain categories

8    shall not exceed 3.25 billion dollars (the "Plan Cap").

9    See Section IV.B.5. of the Plan.  The Government's Claims

10    are within the group of General Unsecured claims covered by

11    the Plan Cap.

12                The Claims Procedures Order entered by this

13    Court on November 9, 2006 (see ECF Docket number 4044)

14    expressly reserved the Debtors' "rights to seek an order of

15    the Court approving additional or different procedures with

16    respect to specific Claims or categories of Claims."  The
Page 40

~8145821.txt

17    Debtors contend that the prompt determination of the

18    allowed amount of Claims is necessary to facilitate the

19    Debtors' emergence from Chapter 11 by the end of 2007.  The

20    debtors are requesting approval of procedures to complete

21    the final estimation of the Claims for purposes of

22    allowance, treatment and distributions in these cases

23    before the end of 2007.  The government requests a more

24    lengthy process, including time for extensive discovery and

25    a full trial before this court or otherwise in March of

                                                    48

1     2008.

2                 With respect to Estimation.  Section 502(c)

3     of the Bankruptcy Code provides that:

4               (c) There shall be estimated for purposes of

5     allowance under this section --

6                    (1) any contingent or unliquidated claim,

7                 the fixing or liquidation of which, as the case

8                 may be, would unduly delay the administration of

9                 the case;

10    11 U.S.C. 502(c) see Frito Lay, Inc. against LTV Steel

11    Company (In re Chateaugay Corp.), 10 F.3d 944, (Second

12    Circuit 1993).  ("A Bankruptcy Court must estimate 'any

13    contingent or unliquidated claim, the fixing or liquidation

14    of which, as the case may be, would unduly delay the

15    administration of the case'"), In re Lionel LLC, 2007

16    Westlaw 2261539 (Bankr. Southern District of New York

17    August 3, 2007) In re G-I Holdings, Inc., 2006 Westlaw

18    2403531, (Bankr. District of New Jersey August 11, 2006)

19    ("Section 502(c) of the Bankruptcy Code is drafted in

20    mandatory terms.  That is, any contingent or unliquidated

                          Page 41

~8145821.txt

21    claim 'shall' be estimated so long as the liquidation of

22    the particular claim would "unduly delay the administration

23    of the case.'"); In re Lane 68 B.R.609, 611 (Bankr.

24    District of Hawaii 1986) ("This duty of the bankruptcy

25    court is mandatory, since the language of [Section 502(c)]

49

1     states 'shall'").  A main goal of the Bankruptcy Code is to

2     equitably distribute the debtor's assets among its

3     creditors.  Lengthy bankruptcy proceedings cause delayed

4     distributions, which in turn, greatly devalue the claims of

5     all creditors as they cannot use the assets until they

6     receive them.  See Paramount Publix Corp., 8 F.Supp.644,

7     646-47 (Southern District of New York 1934) ("Time is of

8     the essence in bankruptcy administration.  An early

9     distribution of the bankrupt's assets among his creditors

10    is imperative").

11                    The government objects to the estimation

12    motion on the grounds that the estimation, and Dana's

13    objection to the Claims, are subject to mandatory or

14    permissive withdrawal to the district court pursuant to 28

15    U.S.C. Section 157(d) and it is apparent that the

16    Government has already filed their motion to withdraw the

17    reference on September 18th, yesterday.  But it is clear

18    from the pleadings before this Court that the dispute is

19    essentially a factual issue.  The Government contends that

20    five of the six government claims, totaling 65 million

21    dollars, are not suitable for estimation or early

22    adjudication because they are relatively small and/or not

23    contingent and unliquidated environmental liabilities,

24    however, these claims add up to 65 million dollars and are

25    essentially unliquidated.  The Government suggests that

~8145821.txt

50

```
 1    document production will be a "major undertaking" and that
 2    fact discovery will be complicated because of the time that
 3    has passed since the alleged contamination took place.  The
 4    Debtors, however, contend that significant portions of
 5    discovery have already been completed and assert that
 6    discovery can be completed in the short timeframe set in
 7    their proposed order.  The Government also complains that
 8    expert testimony in the case will be extremely time
 9    consuming because of the large areas involved and the
10    expertise required and cannot be completed in the timeframe
11    proposed by the Debtors, but apparently they do think that
12    they can complete discovery within their timeframe, which
13    is also aggressive.
14              The Government's Claims are the largest
15    remaining unliquidated disputed claims in these cases.  A
16    delay in the resolution of the Claims may impact the
17    ability of the Debtors to emerge from bankruptcy in a
18    timely manner.  The Debtors did not bring this time
19    restraint on themselves.  Congress enacted in the recent
20    amendments to the Bankruptcy Code, a limitation on the
21    courts' ability to extend exclusivity and elongate the
22    process.  The Debtors' exclusivity now expires eighteen
23    months after the date that the petition was filed.  In a
24    case such as the one currently before the Court, the
25    Debtors have had much to accomplish in those eighteen
```

51

```
 1    months.  These Debtors negotiated new customer agreements
 2    which came on before the court in a very substantial nature
```

~8145821.txt

3    this morning, secured their management team, renegotiated

4    trade agreements, and resolved substantial and complex

5    issues with their unions, breaking new ground in labor

6    management issues for this industry.  The Court cannot

7    fault the Debtors, as the Government suggests, for not

8    litigating the environmental claims earlier in these

9    proceedings, they have had, and this Court has had, a very

10   full plate.

11           If these Debtors were required to reserve

12   the full amount of the claims filed, the creditors would be

13   held hostage to the Government's plan for drawn out

14   discovery and litigation.  If the Debtors are able to

15   confirm their Plan by the end of this year or shortly

16   thereafter, long, drawn out discovery and litigation

17   between the Debtors and the Government should not preclude

18   Dana's creditors from receiving their distributions

19   measured in billions of dollars.

20           With respect to procedures.  Although the

21   Bankruptcy Code does not explicitly detail procedures for

22   estimating claims, a Bankruptcy Court may use whichever

23   method is best suited to the circumstances.  Bittner

24   against Borne Chemical Company, 691 F.2d 134, 135 (3d

25   Circuit 1982); In re Seaman's Furniture Company of Union

52

1    Square, Inc., 160 BR at 41.  In In re Baldwin-United Corp.,

2    55 B.R. 885, 889 (Bankr. Southern District of Ohio 1985)

3    there the court utilized procedure akin to a summary trial

4    where there was no jury, live testimony by one witness per

5    party, a discovery cutoff date, and only two days for the

6    hearing.  Many costs adhere to the method set forth in the

7    Baldwin-United case.  See, for example, In re MacDonald 128

Page 44

~8145821.txt

8    B.R. 161, 166-67 (Bankr. Western District of Texas 1991)
9    (employing an abbreviated procedures practically the same
10   as Baldwin-United); In re Apex Oil Company, 92 B.R. 843
11   (Bankr. Eastern District of Missouri 1988) (utilizing a
12   methodology analogous to Baldwin-United); NLRB against
13   Greyhound Lines (In re Eagle Bus Manufacturing), 158 B.R.
14   421 (District of Texas 1993) (two-day summary trial);
15   DeGeorge Financial Corp. against Novak (In re DeGeorge
16   Financial Corp.), 2002 U.S. District LEXIS 17621 (District
17   of Connecticut 2002) (a one-day trial).  Although this is
18   not the only method of conducting the estimation procedure
19   (see In re Nova Real Estate Investment Trust 23 B.R. 62, 65
20   (Bankr. Eastern District of Virginia 1982), a longer
21   method, such as a full-blown trial on the merits, would
22   "eviscerate the purpose underlying Section 502(c)."
23   "Baldwin-United 55 B.R. at 899.  Moreover, a more time
24   consuming method would run counter to the "efficient
25   administration of the bankrupt's estate ..." Bittner, 691

                                                        53

1    F.2d at 135.  Furthermore, in estimating the value of a
2    claim, the Court of Appeals for the Second Circuit has
3    stated that the courts should make a "speedy and rough
4    estimation of [the] claims for purposes of determining
5    [claimant's] voice in the Chapter 11 proceedings ..."  In
6    re Chateaugay Corp., 944 F.2d 997, 1006 (2d Cir. 1991).
7                    In view of the inability of the parties
8    here to agree on a reasonable reserve sum, and a timeline
9    calculated to permit a substantial and timely distribution
10   to the billions of dollars of other creditors, I do approve
11   the Motion to Estimate.  The timeline submitted by the

~8145821.txt

12    Debtors for discovery, pretrial briefing, and the initial

13    hearing on matters of law for this court is approved, with

14    certain changes to account for the Court's calendar, that

15    is a trial hearing to be held in January of 2008.    That

16    would be early January 2008.

17                    Accordingly, the Debtors' Motion is

18    approved.

19                    MR. ELLMAN:    Thank you, your Honor.    We do

20    have a form of order.    Should we coordinate with chambers

21    on a date?    Would you like us to just submit the order and

22    you can fill in the blanks?

23                    THE COURT:    You can coordinate with

24    chambers on the dates, and you can coordinate because we

25    will have a chambers conference right now on scheduling.

                                                                54

1                    MR. YANKWITT:    Your Honor, just simply, if

2    the hearing is going to be in January rather than December,

3    we would ask that schedule be pushed on the interim dates

4    by a week or two just to --

5                    THE COURT:    The debtors have already

6    indicated in their proposal that they are accommodating the

7    schedule in accordance with the final hearing date, so that

8    application is granted.

9                    I'll see you all in chambers.

10                    MR. ELLMAN:    Thank you, your Honor.    That's

11    the end of our agenda.

12                    THE COURT:    Thank you all.

13                    (End of Proceedings.)

14

15

16

~8145821.txt

```
17
18
19
20
21
22
23
24
25
```

⚲

                                                                    55

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF NEW YORK        }
                                }    SS.:
 4     COUNTY OF WESTCHESTER    }

 5

 6                I, Denise Nowak, a Shorthand Reporter and

 7          Notary Public within and for the State of New

 8          York, do hereby certify:

 9                That I reported the proceedings in the

10          within entitled matter, and that the within

11          transcript is a true record of such proceedings.

12                I further certify that I am not related,

13          by blood or marriage, to any of the parties in

14          this matter and that I am in no way interested

15          in the outcome of this matter.

16                     IN WITNESS WHEREOF, I have hereunto

17          set my hand this _____ day of

18          _____, 2007.

19

20
                        _____
                             DENISE NOWAK
                             Page 47
```

~8145821.txt

21

22

23

24

25