# **EXHIBIT C**

Part 2 of 2

compounds (VOC), such as tetrachloroethylene (PCE), as a degreasing solvent to clean the piston rings.

27.  There have been actual and threatened releases of hazardous substances at the Hastings Facility.  In the 1980s, Dana notified EPA of two releases of PCE into the environment at the Facility, and of another such release in 1998.  In 1998, Dana performed soil sampling and groundwater sampling which showed high levels of PCE contamination in the soil and in the groundwater, along with other hazardous substances.  Subsequent investigations by Dana confirmed these findings, and investigations conducted by the State of Nebraska and EPA found further evidence of significant VOC groundwater contamination that extends from the Facility and continues for approximately two miles in an easterly direction.

28.  In November 2003, Dana and the Nebraska Department of Environmental Quality (NDEQ) entered into Memorandum of Agreement under a voluntary state program, which required Dana to perform response action at the Facility, including the installation and operation of systems to address contaminated soil and groundwater.

29.  In December 2003, Dana sold the Hastings Facility to TAZ, LLC. But, as part of this sale, Dana was granted an easement to enter the property for purposes of continuing to perform the remediation activities and Dana retained ownership of

13

the systems being used to treat the soil and groundwater contamination, and the building that housed such treatment systems.

30. In November 2005, NDEQ terminated the Memorandum of Agreement with Dana due to Dana's unwillingness to perform all response action required by NDEQ.

31. In April 2006, EPA listed the Hastings Facility on the the National Priorities List.

32. In response to the actual and threatened releases of hazardous substances at the Hastings Facility, EPA has incurred, and will continue to incur, response costs that are not inconsistent with the National Contingency Plan, promulgated under Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300. Through July 22, 2006, EPA has incurred $356,200.64, not including prejudgment interest, in unreimbursed response costs in connection with the Hastings Facility. EPA expects substantial additional response activities to fully assess and address contamination from the release of hazardous substances at or in connection with the Hastings Site over the next 20 years. EPA presently estimates that the cost for such future response activities will be approximately $7,894,000.

33. Because Dana was an owner and operator of the Hastings Facility at the time of disposal of hazardous substances, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), (in addition to still retaining ownership

of the building where the treatment systems are located), Dana is jointly and severally liable to the United States for all unreimbursed response costs incurred and to be incurred by the United States in connection with the Hastings Facility, plus prejudgment interest on such costs. The United States hereby asserts a claim against Dana for all unreimbursed past and future response costs (plus interest) for the Hastings Facility, which are currently estimated to be at least $8,243,000.

### Cornell-Dubilier Electronics, Inc. Superfund Site

34. The Cornell-Dubilier Electronics, Inc. Superfund Site is located in South Plainfield, New Jersey, and consists of a former manufacturing property containing 18 buildings on a 26-acre parcel; adjacent contaminated residential and commercial properties; contaminated groundwater and associated soil vapor; and contaminated sediments in the Bound Brook corridor ("CDE Facility").

35. Dana and its corporate predecessor, Spicer Manufacturing Corp. (collectively Dana), owned the manufacturing property that is part of the Facility from approximately 1914 until 1956. From approximately 1936 until 1956, Dana leased the manufacturing property to Cornell-Dubilier Electronics, Inc. ("CDE"), where CDE operated and manufactured electronic components, including capacitors. During the period when Dana owned a portion of the Facility and leased it to CDE, CDE used polychlorinated biphenyls ("PCBs") and chlorinated organic solvents in manufacturing processes and disposed of PCB-contaminated materials and other hazardous substances.

36. There have been actual and threatened releases of hazardous substances at the CDE Facility. Soil, sediment and surface water sampling and analysis conducted by EPA revealed that elevated levels of PCBs, volatile organic compounds and inorganics are present at the CDE Facility.

37. In July 1998, EPA listed the CDE Facility on the National Priorities List. The CDE Facility has since been divided into four operable units ("OUs" and individually "OU1" through "OU4").

38. EPA issued the Record of Decision ("ROD") for OU1 on September 30, 2003. The OU1 ROD calls for the excavation of soils contaminated with PCBs from certain residential and commercial properties, and the investigation of additional

properties to determine which such properties will require remediation. After Dana declined to make an offer to reimburse EPA's past costs or perform the OU1 work, in August 2004, EPA issued a unilateral administrative order ("UAO") CERCLA-02-2004-2030 to Dana (and two other parties) to perform the OU1 remedial design and remedial action ("RD/RA"). The Debtor refused to perform the work required under the UAO. As discussed below (in the Section "Injunctive Obligations Under Environmental Statutes"), this Proof of Claim is filed in a protective manner with respect to Dana's obligation to perform work under the UAO. EPA estimates that it will cost Dana and other jointly and severally liable parties $3.5 million to perform the OU1 RD/RA.

39. On September 30, 2004, EPA issued the ROD for OU2, which addresses contaminated soil and buildings at the former manufacturing property that is part of the CDE Facility. The remedy for OU2 calls for excavation of some contaminated soils and capping of the remainder and demolition of contaminated buildings. The most heavily contaminated soils either will be treated on-site using low temperature thermal desorption or disposed of off-site. Currently, EPA is performing the remedial design for OU2. The cost estimate for performance of the OU2 RD/RA is $89.5 million.

40. OU3 addresses contaminated groundwater and associated soil vapor at the CDE Facility. In July 2005, the Debtor entered into an administrative order on consent ("AOC"), CERCLA-02-2005-2024, to perform the remedial investigation/feasibility study ("RI/FS") for OU3. EPA was nearing completion of its review of the draft work plan prepared by the Debtor, when it was advised by the Debtor, by a letter dated May 1, 2006, that the Debtor would cease compliance with the AOC. As discussed below (in the Section "Injunctive Obligations Under Environmental Statutes"), this Proof of Claim is filed in a protective manner with respect to Dana's obligation to perform work. Since investigations at the CDE Facility are continuing and the OU3 remedy has not yet been selected, the cost to Dana and other jointly and severally liable parties of the OU3 work is uncertain at this time, but EPA currently estimates that remedial investigation and RD/RA work with respect to OU3 will cost Dana and other jointly and severally liable parties approximately $25 million.

41. OU4 at the CDE Facility addresses the contaminated sediments in the Bound Brook corridor. Since investigations at the Facility are continuing and the final remedy has not yet been selected, the cost of the OU4 work is uncertain at this time, but

18

EPA currently estimates that remedial investigation and RD/RA work with respect to OU4 will cost approximately $55 million.

42. In response to the actual and threatened releases of hazardous substances at the CDE Facility, EPA has incurred, and will continue to incur, response costs that are not inconsistent with the National Contingency Plan, promulgated under Section 105 of CERCLA, 42 U.S.C. § 9605, and set forth at 40 C.F.R. Part 300. As of July 14, 2006, the United States has incurred at least $7 million, not including prejudgment interest, in unreimbursed response costs in connection with the CDE Facility.

43. EPA expects substantial additional response activities will be necessary to fully assess and address contamination from the release of hazardous substances at or in connection with the CDE Facility. As noted above, EPA presently estimates that the cost for performance of the OU1 RD/RA is $3.5 million, and that the cost for performance of the OU2 RD/RA is $89.5 million. Investigations at the CDE Facility are continuing with respect to OU3 and OU4 and, although the cost of the OU3 and OU4 work is uncertain at this time, EPA presently estimates that remedial investigation and RD/RA work with respect to OU3 and OU4 will cost approximately $80 million. See Paragraphs 40 and 41, supra ($25 million plus $55 million). In addition, if EPA (as opposed to a responsible party) performs the work at the

19

Facility, EPA estimates that it will incur indirect costs of approximately $50 million.

44. Because Dana was an owner and/or operator of the CDE Facility at the time of disposal of hazardous substances, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Dana is jointly and severally liable to the United States for all unreimbursed response costs incurred and to be incurred by the United States in connection with the CDE Facility, plus prejudgment interest on such costs. The United States hereby asserts a claim against Dana for all unreimbursed past and future response costs (plus interest) for the CDE Facility, and a protective claim for Dana's performance of work under the UAO and AOC.

### CERCLA UAO AND AOC PENALTY CLAIMS - CDE FACILITY

45. By this Proof of Claim, EPA also asserts a claim for violation of the UAO issued to the Debtor (and other PRPs) in August 2004 for the performance of the OU1 RD/RA (CERCLA-02-2004-2030) at the CDE Facility for civil penalties and punitive damages.

46. Section 106(b) of CERCLA, 42 U.S.C. § 9606, as amended by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Act of 1996, 31 U.S.C. § 3701, and codified at 40 C.F.R. Part 19, provides that Debtor is subject to civil penalties of up to $32,500 per day for each day after March 15,

2004, in which Debtor, without sufficient cause, willfully violates, or fails or refuses to comply with any UAO issued by EPA under Section 106. Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), further provides that Debtor may be liable to the United States for punitive damages in "an amount at least equal to, and not more than three times, the amount of any costs incurred by [EPA]," where Debtor, as a liable person under Section 107, fails without sufficient cause to properly provide removal or remedial action required pursuant to an order issued under Section 104 or 106 of CERCLA.

47. Civil penalties of up to $32,500 a day began accruing on September 29, 2004, when the Debtor stated its refusal to perform, and continued accruing for 404 days until November 7, 2005, when EPA mobilized to perform the remedial action. The total amount of these civil penalties is up to $13,130,000 ($32,500 times 404 days). Although punitive damages under Section 107(c)(3) of CERCLA cannot be calculated until EPA has completed the OU1 RD/RA, this section provides that Debtor may be liable for punitive damages in "an amount at least equal to . . . the amount of any costs incurred by [EPA]," which, as stated above, are currently estimated to be $3.5 million.

48. By this Proof of Claim, EPA also asserts a claim for stipulated penalties for violation of the AOC CERCLA-02-2005-2024 for OU3, which the Debtor recently ceased performing. Specifically, the AOC provides for a stipulated penalty of $200,000, where, as here, Debtor has stopped performing the work required under the AOC and EPA has had to take over the work that the Debtor was to perform under the AOC.

## CERCLA NATURAL RESOURCES DAMAGES CLAIM

49. Section 107(f) of CERCLA, 42 U.S.C. § 9607(f), provides for recovery of damages for injuries to, destruction of, or loss of natural resources caused by releases of hazardous substances to the environment. Injured resources may include, but are not limited to, birds, mammals, fish and other wildlife, plants, and their supporting habitats at or near the facilities. CERCLA specifies that the United States, acting through NOAA and FWS, among other agencies, is authorized to act on behalf of the public as a trustee of natural resources to recover such damages, as well as the reasonable costs of assessing the injury, destruction, or loss (referred to herein collectively as "natural resource damages").

50. As an owner and/or operator of the CDE Facility at the time of disposal of hazardous substances, as discussed above, Dana is liable to the United States for injuries to natural resources caused by the release of hazardous substances at the CDE Facility, including in Bound Brook and its

22

floodplain emergent and forested wetlands, from the former CDE manufacturing property down to and including New Market Pond and the tributaries to Bound Brook and their floodplains, including Spring Lake, for the period beginning in 1981 and continuing until restoration is expected to reach full functionality.

51. Under CERCLA and the governing natural resource damage assessment regulations, the measure of damages includes the cost to restore, replace, or acquire the equivalent of the injured natural resources, plus the reasonable costs of assessing the damages. As remedial action has not been completed, the eventual amount of natural resource damages, including the reasonable costs of assessing the existence and extent of such damages, is unknown. However, applying standardized estimation techniques, the United States presently estimates that the aforementioned natural resource damages are between $20 million and $37 million. This estimate includes approximately $1 million of damages to recreational fishing due to the fish consumption advisories on the Bound Brook corridor. It also includes a range of $19 million to $36 million in damages for ecological injury in the referenced area. Finally, the claim includes costs incurred, and to be incurred, by NOAA and FWS associated with assessment of the natural resource damages at the Facility. This Proof of Claim is filed for these natural resource damages and assessment costs as well. Other potentially responsible parties may, along

23

with the Debtor, also be jointly and severally liable to the United States under CERCLA with respect to natural resource damages at the Site.

### CLEAN WATER ACT PENALTY CLAIMS

52. The basis for Debtor's liability with respect to the Muskegon Facility in Muskegon, Michigan is as follows:

(a) Section 307(d) of the CWA, 33 U.S.C. § 1317(d), prohibits any owner or operator of any source from introducing pollutants into public owned treatment works ("POTWs") in violation of any effluent standard or prohibition or pretreatment standard promulgated under Section 307 of the CWA.

(b) Pursuant to Section 307(b) of the CWA, 33 U.S.C. § 1317(b), EPA has promulgated pretreatment standards applicable to industrial users in certain industry sectors (40 C.F.R. Chapter I, Subchapter N).

(c) At all relevant times, the Debtor was subject to federal categorical pretreatment standards for Metal Finishing and Metal Molding and Casting, set forth at 40 C.F.R. Part 433, Subpart A, and Part 464, Subpart C, which apply to discharges of process wastewater to POTWs resulting from metal finishing operations and ferrous casting operations, respectively.

(d) On numerous occasions between January 1999 and June 2000, the Debtor discharged wastewater from metal finishing operations and/or metal molding and casting operations to the Muskegon POTW in violation of applicable federal categorical

24

pretreatment limits set forth in 40 C.F.R. Part 433, Subpart A, and/or Part 464, Subpart C for several pollutants, including, but not limited to, copper, lead and zinc.

(e) Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), as amended by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Act of 1996, 31 U.S.C. § 3701, and codified at 40 C.F.R. Part 19, the Debtor is subject to civil penalties of up to $27,500 per day for each violation that occurred from January 31, 1997, through March 15, 2004.

(f) On or about January 19, 2006, Dana executed a signature page for a proposed Consent Decree that would have settled the United States' civil claims against Dana at the Muskegon Facility under the CWA, subject to the terms provided therein, which included Dana's payment of a civil penalty in the amount of $145,000.00. Dana filed for bankruptcy before the proposed Consent Decree was approved and executed by the appropriate officials for the United States and lodged and entered as a final judgment in district court. On this basis, therefore, Debtor is liable to the United States for a civil penalty of at least $145,000 for these violations or such other amount as determined by a court or tribunal with jurisdiction.

25

## INJUNCTIVE OBLIGATIONS UNDER ENVIRONMENTAL STATUTES

53. Dana has injunctive obligations to comply with environmental requirements applicable to its facilities, including, but not limited to, obligations to perform environmental assessment and remediation work at its facilities under: (1) an Administrative Consent Order under Section 3008(h) of RCRA relating to its facility located in Antwerp, Ohio, EPA Docket No. RCRA-05-2003-0009; and (2) remaining work requirements under CERCLA administrative orders described above.

54. Dana may have other injunctive obligations to remedy environmental violations and/or releases of hazardous materials at its facilities, including, but not limited to, the environmental law violations and releases of hazardous materials at sites owned by Dana as listed in Dana's response to Questions 17.a, 17.b. and/or 17.c and other parts of its Statement of Financial Affairs and Schedules.

55. It is the United States' position that it is not required to file a proof of claim with respect to Dana's injunctive obligation to comply with work requirements under administrative orders or consent decrees, and to comply with other environmental requirements imposed by law. Dana and any reorganized debtor(s) must comply with the mandatory injunctive requirements of those orders and decrees, and must comply with other environmental requirements imposed by law.

56. Regulatory obligations are mandatory injunctive obligations with which Dana must comply, and for which proofs of claim need not be filed under the Bankruptcy Code. Nevertheless,

26

this claim is filed in a protective fashion only to protect the United States' rights with respect to such obligations of Dana. The United States reserves the right to take future actions to enforce any such obligations of Dana. Nothing in this Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies.

### DEBTOR-OWNED SITES

57. Dana also has or may in the future have environmental liabilities for properties that are part of its bankruptcy estate and/or for the migration of hazardous substances from property of its bankruptcy estate. In accordance with 28 U.S.C. § 959, Dana is required to comply with non-bankruptcy law, including all applicable environmental laws and permits, in managing and operating its property, such as the obligation to secure and maintain financial assurance with respect to any hazardous waste treatment, storage, management and/or disposal facility under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, and regulations promulgated thereunder, for which it is listed as the owner or operator in the applicable RCRA permit. Upon confirmation of any Plan of Reorganization, reorganized Dana will be liable as owner or operator of property in accordance with applicable environmental law. The United States is not required to file a proof of claim relating to property of the estate other than for response costs incurred prior to the petition date. The United States reserves the right to file an application for

administrative expense or take other appropriate action in the future with respect to property of the estate.

### ADDITIONAL PROOF OF CLAIM TERMS

58. No judgments against the Debtor have been rendered on this Proof of Claim.

59. No payments have been made by the Debtor on this claim.

60. This claim reflects the known liability of the Debtor to the United States on behalf of EPA, NOAA and FWS. The United States reserves the right to amend this claim to assert subsequently discovered liabilities. This proof of claim is without prejudice to any right under 11 U.S.C. § 553 to set off, against these claims, debts owed (if any) to the Debtor by these or any other federal agency.

61. The United States has not perfected any security interest on its claim against the Debtor.

62. This claim is filed as a general unsecured claim except to the extent of any secured/trust interest in insurance proceeds received by the Debtor on account of environmental claims of the United States, and to the extent administrative expense priority exists related to property of the estate, post-petition violations of law, or otherwise. The United States will

28

file any application for administrative expense priority at the appropriate time.

Dated:     New York, New York
           September 21, 2006

        Respectfully submitted,

        MICHAEL J. GARCIA
        United States Attorney for the
        Southern District of New York

By:

        RUSSELL M. YANKWITT (RY-6487)
        Assistant United States Attorney
        86 Chambers Street
        New York, New York  10007
        Telephone: (212) 637-2745
        Facsimile: (212) 637-2686

        W. BENJAMIN FISHEROW
        Deputy Chief
        Environmental Enforcement Section
        Environment and Natural Resources
          Division
        U.S. Department of Justice

        MARC BORODIN
        PETER KAUTSKY
        Environmental Enforcement Section
        Environment and Natural Resources
        Division
        U.S. Department of Justice
        P.O. Box 7611, Ben Franklin Station
        Washington, D.C. 20044
        Telephone: (202) 514-2756
        Facsimile: (202) 616-6584