# **EXHIBIT D**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:   RUSSELL M. YANKWITT
      PIERRE G. ARMAND
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2745
Facsimile:  (212) 637-2730

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re                                         :      07 Civ. _____ (    )
                                              :
Dana Corporation, et al.,                     :      Chapter 11
                                              :      Bankr. Case No. 06-10354 (BRL)
                                              :      (Jointly Administered)
                    Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF PETER MANNINO IN SUPPORT OF THE GOVERNMENT'S MOTION TO WITHDRAW THE REFERENCE

I, PETER MANNINO, pursuant to 28 U.S.C. §1746, do hereby swear to the following:

1.   I am employed by the United States Environmental Protection Agency ("EPA") as the Remedial Project Manager for the Cornell-Dubilier Electronics, Inc. Superfund Site (the "CDE site" or the "Site"). I have held this position since the Fall of 1997. I submit this Declaration in support of the United States' Motion for Withdrawal of the Reference Pursuant to 28 U.S.C. § 157(d) in connection with the above-captioned matter. This Declaration is based on my personal knowledge concerning the Site and my review of documents in the Site file and administrative record for the Site.

2.   My educational background is in sciences. I have taken undergraduate courses in biology, chemistry, physics, and mathematics. I have a Bachelors of Arts from Hamilton

College. I have been employed at EPA for over 10 years as a Remedial Project Manager in the Emergency and Remedial Response Division. In addition, prior to that, I was an inspector and permit writer in the Air Waste Management Division for six years.

3.  I am currently responsible for managing the clean-up of five National Priority List sites (Superfund sites), in various stages of the remedial process, including the Superfund site in South Plainfield, New Jersey, which Dana Corporation owned during the time the Site was operated by Cornell-Dubilier Electronics, Inc. ("CDE").

4.  As Remedial Project Manager I am responsible for managing the Remedial Investigation and Feasibility Study ("RI/FS") performed for the Site, and the remedial activities at the Site.

5.  The property formerly owned by Dana and operated by CDE (the "Facility") now operates as an industrial park, which consists of approximately 26 acres, containing buildings that until recently were used by commercial and industrial tenants. The CDE site also includes contaminated residential, commercial, and municipal properties in the vicinity of the Facility, contaminated groundwater, and contaminated soil and sediments in the Bound Brook corridor.

6.  While Dana owned the Facility, CDE used polycholorinated biphenyls ("PCBs") and chlorinated organic solvents in its manufacturing processes, and spilled and disposed of PCB-contaminated materials and other hazardous substances within the buildings, and directly on the Facility soils.

7.  During this time, CDE also disposed of defective capacitors in a low-lying open area on the property. CDE's activities led to migration of contaminants to the area near the Facility. As a result of environmental investigations performed at the CDE site, EPA has

detected PCBs in the groundwater, soils and in building interiors at the industrial park, at adjacent residential, commercial, and municipal properties, and in the surface water and sediments of the Bound Brook.

8. EPA has also found high levels of volatile organic compounds ("VOCs") in the Facility soils and in the groundwater at the CDE site.

9. From the time CDE stopped using the Facility property in 1962, it has been operated as a rental property, occupied by more than 100 commercial and industrial companies. However, the majority of the disposal of hazardous substances occurred while Dana owned the Facility and was leasing the property to CDE.

10. In June 1996, at the request of the New Jersey Department of Environmental Protection ("NJDEP"), EPA collected and analyzed surface soil, surface water, and sediment samples at the CDE site. The results of the analysis revealed that elevated levels of PCBs, VOCs and inorganics were present at the site.

11. In January 1997, EPA issued notices of liability to CDE and DSC advising them of their status as potentially responsible parties ("PRPs") for the CDE site. In March 1997, EPA ordered DSC to perform a removal action to mitigate risks associated with contaminated soil and surface water runoff at the Facility.

12. In October and November 1997, EPA collected soil and interior dust samples from residential properties near the Facility, and concluded that exposure to PCBs in dust and soil posed a potential health concern for residents of the properties tested. To limit the potential for exposure to PCBs until a final remedy could be selected, in March 1998, EPA undertook removal activities to clean residential properties near the Facility.

13. EPA cleaned the interiors of several homes, and entered into an administrative order on consent ("AOC") with D.S.C. of Newark Enterprises, Inc.[1] and CDE for removal of contaminated soil from the affected properties. In February 1998, EPA entered into an AOC with CDE and Dana for removal of contaminated soil from seven additional properties.

14. In 2000, EPA initiated the RI/FS for the CDE site. EPA divided the Site into four operable units ("OUs").

15. EPA completed the RI/FS for OU1, consisting of contaminated soil and interior dust at residential, commercial and municipal properties in the vicinity of the Facility, in August 2001. EPA issued the Record of Decision ("ROD") for OU1 on September 30, 2003.

16. The OU1 ROD calls for the excavation of soils contaminated with PCBs from several properties, and the investigation of additional properties in a defined study area during the remedial design phase to determine which, if any, additional properties will require remediation.

17. In March 2004, EPA wrote to Dana, demanding payment of costs incurred at the CDE site, inviting Dana to make a good faith offer to perform the remedial design and remedial action ("RD/RA") that EPA had selected for OU1. Dana declined to make an offer to pay any costs or perform the work. Thereafter, in August 2004, EPA issued a unilateral administrative order ("UAO") to Dana.

18. Dana, again, declined to perform the work required. Dana asserted that it had

---

[1] In June 1961, CDE sold the Facility to Lamitex, Inc. and C.R.D. Realty Corp., but CDE remained as a tenant on the property until June 1962. Lamitex and C.R.D. Realty Corp. were later merged into Marco Investing Corp., and, in November 1976, Marco sold the property to a sister corporation, the corporate predecessor of the current owner, D.S.C. of Newark Enterprises, Inc. ("DSC").

sufficient cause to refuse to perform on the asserted grounds that: 1) it had never owned the properties that comprise OU1, the spread of contaminants to the OU1 properties likely occurred after Dana had sold the Facility and the definition of the "Site" should properly be limited to the Facility; 2) there is no imminent and substantial endangerment to support the issuance of a UAO for the OU1 RD/RA; 3) the RI/FS and the ROD for OU1 prepared by EPA are not consistent with the National Contingency Plan ("NCP"); and 4) the harm is divisible, and Dana should not have to pay for any cleanup of PCBs because it never used PCBs in its own operations.

19. On September 30, 2004, EPA issued the ROD for OU2, which addressed contaminated soil and buildings at the Facility. The ROD for OU2 calls for excavation of capacitors discarded on the property by CDE as well as some of the contaminated soils, and capping of the remainder of the soils. The most heavily contaminated soils will be either treated on-site using low temperature thermal desorption or transported off-site for disposal if EPA determines that thermal desorption is not suitable.

20. EPA is performing the remedial design for OU2, and has also begun the OU2 remedial activities. To date, EPA has demolished approximately half of the contaminated buildings located in OU2.

21. In July 2005, Dana entered into an AOC with EPA to perform the RI/FS for OU3, which addressed contaminated CDE site groundwater and associated soil vapor, under EPA's oversight.

22. On February 3, 2006, Dana submitted a draft work plan for EPA's review and comment.

23. This groundwater investigation will be complex, given the complicated

hydrogeology in this part of New Jersey, the fact that trichloroethylene ("TCE") contamination is known to be widely present in the South Plainfield groundwater, and the possibility that other sources of contamination will be identified.

24.   EPA was nearing completion of its review of the draft work plan, when Dana advised EPA, by a letter dated May 1, 2006, that in light of its bankruptcy, Dana would cease compliance with the AOC.

25.   After Dana ceased performance of the OU3 RI/FS, EPA was compelled to undertake this work. EPA expects to complete the RI/FS for OU3 and the RI/FS for OU4, which concerns the contaminated soil and sediments in the Bound Brook, within the next two and a half years.

26.   While sufficient information is available concerning the CDE site conditions for EPA to draw reasonable conclusions and reach an understanding of the remedial activities that will likely be required at the CDE site to remediate the groundwater contamination and associated soil vapor in OU3, presenting an estimate of the cost for the remedial action for OU3 will require EPA to examine carefully many variables associated with the construction, operation and maintenance of the groundwater treatment system.

27.   Similarly, preparing and presenting a cost estimate for the OU4 remedy, and the long-term monitoring that will likely be required following removal of contaminated soils and sediments, will require examination of complex environmental, ecological and engineering issues.

28.   These issues will include the nature and extent of contamination, the current and future uses of the Bound Brook and resulting pathways of exposure, the volume of contaminated

material likely to be excavated (including capacitors buried in the banks of the Bound Brook adjacent to the Facility), the expected treatment and disposal costs for the excavated materials, the duration of the remedy, the long-term monitoring of conditions, and the nature of the relevant site conditions.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on:   September 18, 2007
               New York, New York

*(signature)*
PETER MANNINO